**In re the Matter of A.H., A Minor,**

**A Child Alleged to be a Child in Need of Services, B.H. and C.H., Appellants–Respondents,**

**v.**

**Department of Child Services, Boone County Office, Appellee– Petitioner.**

No. 06A01–0905–JV–222.

Court of Appeals of Indiana.

Sept. 21, 2009.

Deborah K. Smith, Thorntown, IN, Attorney for Appellant.

Jon R. Rogers, Lebanon, IN, Attorney for Appellee.

## OPINION

BROWN, Judge.

B.H. ("Father") and C.H. ("Mother," and together with Father, "Parents") appeal the trial court's order determining that A.H. is a child in need of services ("CHINS") and the dispositional order following that determination. Parents raise one issue, which we restate as whether sufficient evidence supports the trial court's determination that A.H. was a CHINS. The Indiana Department of Child Services ("DCS") raises one additional issue, which we restate as whether the trial court abused its discretion by excluding certain evidence relating to adjudications involving the Parents' other children. We affirm.

The facts most favorable to the trial court's order follow. On October 10, 2008, A.H. was born to Father and Mother at Witham Memorial Hospital in Lebanon, Indiana. On October 12, 2008, the DCS removed A.H. from the care of Parents, based upon statements made by the nursing staff at the hospital to a family case manager for DCS, without a court order, and gave Parents a form advisement of legal rights. On October 14, 2008, Parents filed a request for an emergency hearing with the trial court requesting the return of A.H. to them. On that same day, the trial court held an emergency hearing and released A.H. back to the care of Parents.

On October 15, 2008, DCS filed a Verified Petition Alleging Child in Need of Services with the trial court. In its Petition, DCS alleged that A.H. was a CHINS based upon information obtained from nursing staff at Witham Memorial Hospital that Parents stated they did not know how to care for A.H. because their other children were girls and that Father repeatedly asked for help with common functions such as changing A.H.'s diaper, dressing A.H., and cleaning A.H.'s face after he spit up.[1] The trial court held a hearing on that same day and found that the allegations contained in the DCS's October 15, 2008 Petition constituted probable cause that A.H. was a CHINS based upon neglect. The trial court also placed A.H. in guardianship pending a fact-finding hearing and determined that Parents should have daily visitation with A.H.

On December 19, 2008, DCS filed a revised Verified Petition Alleging Child in Need of Services.[2] The revised December

---

1. The October 15, 2008 Petition also included information related to F.C., a child of Mother, and S.H., a child of Mother and Father. According to the Petition, F.C. and S.H. had been removed from Parents' care because both children had bleeding diaper rash, F.C. had a staph infection, Parents refused to take S.H. to the doctor and had not taken her to the doctor since her birth, Parents began feeding table foods to S.H. when she was only days old, and Parents repeatedly stated that no one can tell them what to do or what to feed their children.

2. On December 12, 2008, DCS filed a motion for leave to amend its October 15, 2008 Petition. The trial court denied DCS's December 12, 2008 motion, but permitted DCS to file a

19, 2008 Petition alleged that A.H. was a CHINS based upon observations of Parents' behavior during their daily visitation with A.H., including observations that Parents refused to participate in "tummy time" with A.H. despite a recommendation to do so to help A.H. develop his neck and back muscles, Parents failed to attend to A.H.'s clogged tear ducts unless instructed to do so, Parents incorrectly pumped breast milk and failed to recognize the amount of milk needed for A.H., Mother fell asleep while holding A.H. several times, Parents frequently cussed loudly at each other in front of their children, Parents did not believe that medical problems existed "unless they see the problem," and Parents "did not believe and did nothing about [A.H.] vomiting and about a hernia" until they observed those issues weeks later. Appellant's Appendix at 65.

At a fact-finding hearing in January 2009, DCS offered to admit evidence related to previous CHINS adjudications involving F.C., a child of Mother, and S.H., a child of Mother and Father. However, the trial court ruled that the probative value of the evidence of the CHINS adjudications of F.C. and S.H. was outweighed by the danger of unfair prejudice under Indiana Rule of Evidence 403.

After the fact-finding hearing, the trial court found that A.H. was a CHINS and ordered that A.H. be removed from Parents' care and placed in foster care. In its Dispositional Order, the trial court ordered that DCS be awarded wardship of A.H. and ordered Parents to participate in a treatment program which included supervised visitation with A.H., parenting education, and additional parenting and psychological assessments.

## I.

■ The first issue is whether sufficient evidence supports the trial court's determination that A.H. was a CHINS. When we review the sufficiency of evidence, we consider only the evidence and reasonable inferences therefrom that are most favorable to the judgment. *In re A.H.*, 751 N.E.2d 690, 695 (Ind.Ct.App.2001), *trans. denied.* We neither reweigh the evidence nor reassess the credibility of the witnesses. *Id.* The DCS was required to prove by a preponderance of the evidence that A.H. was a CHINS. *Id.*

When a court's orders contain specific findings of fact and conclusions of law, we engage in a two-tiered review. *Hallberg v. Hendricks County Office of Family & Children,* 662 N.E.2d 639, 643 (Ind.Ct.App. 1996). First, we determine whether the evidence supports the findings. *Id.* Then, we determine whether the findings support the judgment. *Id.* We reverse the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if it is unsupported by the findings and conclusions. *Id.* "In practical terms, however, we may look first to determine whether the judgment is supported by the findings. If it is not so supported, our review is concluded." *In re T.H.*, 856 N.E.2d 1247, 1250 (Ind.Ct.App.2006) (internal citations omitted). When deciding whether the findings are clearly erroneous, we consider only the evidence and reasonable inferences therefrom that support the judgment. *Matter of E.M.*, 581 N.E.2d 948, 952 (Ind.Ct.App.1991), *trans. denied.*

Ind.Code § 31–34–1–1 governs the CHINS determination and provides:

A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1) the child's physical or mental condition is seriously impaired or serious-

new petition. As a result, DCS filed the revised Petition on December 19, 2008.

ly endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

 (A) the child is not receiving; and

 (B) is unlikely to be provided or accepted without the coercive intervention of the court.

 The CHINS statute, however, does not require that a court wait until a tragedy occurs to intervene. *Roark v. Roark*, 551 N.E.2d 865, 872 (Ind.Ct.App. 1990). Rather, a child is a CHINS when he or she is endangered by parental action or inaction. *Id.* The purpose of a CHINS adjudication is not to punish the parents, but to protect the children. *In re A.I.*, 825 N.E.2d 798, 805 (Ind.Ct.App.2005), *trans. denied.*

 Parents argue that the evidence is insufficient to sustain the trial court's conclusion that A.H. was a CHINS. Specifically, Parents appear to argue that the evidence and findings do not support Paragraphs 128 or 129 of the Order or the trial court's conclusion that A.H. was seriously

endangered.[3] DCS argues that the trial court's findings support its conclusions of law. We discuss the evidence and findings in support of Paragraphs 128 and 129 of the Order separately.

### A. *Paragraph 128 of the Order*

Parents first appear to argue that the evidence does not support the trial court's findings and that the findings do not support the conclusions in Paragraph 128 of its Order. Paragraph 128 of the Order provides:

128) The parents have demonstrated an overall inability or refusal to understand, retain and follow through with appropriate parenting advice given to them by [A.H.'s] care givers. Specifically:

a. The parents were instructed on the difference between milk and formula but did not always seem to understand the difference.

b. The parents were instructed about the proper frequency of burping the child but did not follow instructions.

c. The parents were instructed that mother should not sleep while holding the child but did not always follow through on the instructions.

---

3. We observe that many of the paragraphs listed in the Order under the heading "Findings of Fact" merely contain short recitations of testimony and witness opinions based upon testimony heard at the fact-finding hearing. *See Parks v. Del. County Dep't of Child Servs.*, 862 N.E.2d 1275, 1279 (Ind.Ct.App.2007) (noting that "the majority of [the trial court's] findings are mere recitation of testimony and witness opinions"). Statements of this kind are "not findings of basic fact in the spirit of the requirement." *Id.* (citing *Perez v. U.S. Steel Corp.*, 426 N.E.2d 29, 33 (Ind.1981)). "[F]indings which indicate that the testimony or evidence was this or the other are *not* findings of fact." *Id.* (quotation and citations omitted). Instead, "[a] finding of fact must indicate, not what someone said is true, but

what is determined to be true, for that is the trier of fact's duty." *Id.*

In addition, we observe that Paragraphs 128 and 129 of the trial court's order, the two paragraphs which Parents appear to challenge, are listed under the heading "Conclusions of Law." However, those paragraphs include a number of factual determinations related to Parents' overall inability or refusal to follow and retain parenting advice and medical advice given to Parents by A.H.'s caregivers, doctors, and nurses, and which provide the basis for the trial court's conclusion that A.H.'s physical condition was seriously endangered. Therefore, some of the trial court's statements in Paragraphs 128 and 129 may be more accurately characterized as findings of fact.

d. The parents were instructed about the proper frequency of changing [A.H.'s] diaper but did [not] always follow through [on the] instructions. On one occasions [sic], father stated that he would change the diaper ever [sic] one half hour to keep from "getting in trouble."

e. The parents were instructed about the proper amount of formula to give the child but did not always follow instructions.

f. The parents showed a misunderstanding about the frequency of feeding the child would require during the night. One night they were up pumping breast milk for a visit the next day. They responded by indicating that they would not have been up at night with [A.H.] if he were with them.

Appellant's Appendix at 30–31. Parents appear to challenge subparagraphs a. through f. of Paragraph 128 and argue that "the issue was not that the parents went for hours or days without meeting the needs." Appellant's Brief at 15. We address the evidence in support of each subparagraph separately.

1. *Parents' understanding of the difference between milk and formula*

With respect to Parents' failure to always understand the difference between milk and formula, the record reveals that the case supervisor employed with Boone County Mental Health of America (the "BCMHA") who worked with Parents in their home in connection with the care of A.H. testified that she "explained to [Parents] a newborns [sic] need to get formula and or breast milk and that the milk you get from the grocery store could not be given to an infant." Transcript at 257–258. The case supervisor also testified that Parents did not understand "the difference between cow's milk versus formula." *Id.* at 257.

2. *Parents' failure to burp A.H.*

With respect to Parents' failure to follow through on instructions regarding the proper frequency to burp A.H., the record reveals that the BCMHA case supervisor testified that she educated Parents "on the proper ways to feed an infant and burp." *Id.* at 262. She testified that "[t]he importance of this was so that the baby not get gassy stomachs and possibly get a bellyache." *Id.* The case supervisor testified that "[M]other would breast feed and she would not burp him unless she was told to stop and burp him." *Id.* at 263. She also testified that she "told [Mother] how often she should burp and that if there's gas in a baby's tummy it could cause severe gas problems where the baby could get tummy ache and cry." *Id.* The case supervisor testified: "[A.H.] started having severe belly aches to where he would cry uncontrollably and bring his little knees up. Both [Parents] were told that it was very important to burp him so that these tummy aches would not maybe happen. They still would not burp him." *Id.*

3. *Mother's falling asleep while holding A.H.*

With respect to Mother's failure to follow through on instructions not to sleep while holding A.H., the record reveals that a visitation supervisor employed by BCMHA who performed supervised visits with Parents and A.H. testified that Mother "had fallen asleep during visitations and she had been advised that if she chooses to sleep during a visit . . . she needs to make sure that [A.H.] is in a safe place and that [Father] will be caring for him while she's taking a nap." *Id.* at 333. The visitation supervisor also testified that "[Mother] has fallen asleep several times with [A.H.] in

her lap." *Id.* at 335. The supervisor "stepped in during these occasions" and "told [Parents] specifically that they need to make sure that [A.H.] is in a safe place." *Id.* On one occasion, Mother was asleep on the couch, A.H. was laying between Father and Mother on the couch, and Father was "watching television not paying attention to [A.H.] either." *Id.* at 336. The BCMHA visitation supervisor also testified that "[a]ctually this has happened several times and every time it happened it has been stated that this is not safe." *Id.*

### 4. *Parents' failure to always change A.H.'s diaper*

With respect to Parents' failure to always follow through on instructions regarding the proper frequency of changing A.H.'s diaper, the record reveals that the BCMHA visitation supervisor testified that she suggested three times to Father that A.H. needed his diaper changed before Father changed the diaper. The visitation supervisor also testified that she recommended to Parents that A.H.'s diaper should be changed not long after A.H. is fed. The visitation supervisor also testified that Father said that he was going to change A.H.'s diaper every half an hour. Father stated that "he's been advised to change their son's diaper every half an hour to keep him from getting in trouble" and that he "was going to change [A.H.'s] diaper every half an hour . . . ." *Id.* at 332.

### 5. *Parents' failure to always give A.H. the proper amount of formula*

With respect to Parents' failure to always follow instructions regarding the proper amount of formula to give A.H., the record reveals that the assistant director of BCMHA who performed home-based visits with Parents and their children testified that he was concerned about Parents' "inability to again follow simple directions

such as doctors [sic] orders." *Id.* at 310. A.H.'s doctor ordered a "certain amount of milk per feedings." *Id.* Also, the BCMHA assistant director testified that he instructed Parents of the proper amount of formula to feed A.H. during his last visitation with Parents and A.H. The BCMHA assistant director also testified that "the response was that I'm not going to let anybody tell me how to feed my child and I'm not going to let my child starve." *Id.* There was also confusion "as to exactly how much they put in the bottle." *Id.* at 311. The assistant director observed "one of the bottles having five ounces when the parents insisted that it was only four and then proceeded to after that give the child another three and one-half ounces. Up to eight and one-half ounces." *Id.*

### 6. *Parents' failure to understand how frequently A.H. needed to be fed during the night*

With respect to Parents' failure to understand the frequency of feeding which A.H. would require during the night, the record reveals that the BCMHA case supervisor testified that she observed that Mother would nurse A.H., but that there was a "concern . . . that maybe [Mother] was not producing enough milk" because the baby "acted as if he was starving" after Mother "would let [A.H.] nurse the whole visit." *Id.* at 259. The case supervisor testified that she recommended numerous times for Mother to see a lactating nurse "so she could get professional advice." *Id.* The case supervisor testified that Parents stated several times that "they would not get up to pump breast milk every two hours." *Id.* at 270. The supervisor "observed [Mother] get frustrated very easily when [A.H.] would cry and not latch on to her breast." *Id.* The BCMHA visitation supervisor testified that she had concerns about Parents' understanding of time. She testified that Fa-

ther would write down when he fed A.H., but "his times [weren't] always accurate" which led to confusion regarding when A.H. was fed. *Id.* at 360. The supervisor testified:

> Sometimes they will write down the wrong time and if the time is incorrect and I notice it throughout the visit it will be noticed because I will say well don't you guys think that [A.H.] needs to eat it's been two hours. And then the argument will start with [Parents] saying it has not been two hours look at our log sheet he ate at this time. When I write it down when he last ate also and the times are incorrect.

*Id.* at 360–361.

Based upon our review of the record, we cannot say that the evidence does not support the trial court's findings or that the findings do not support the conclusions in Paragraph 128 of its Order.

### B. *Paragraph 129 of the Order*

Parents also appear to argue that the evidence does not support the trial court's findings and that the findings do not support the conclusions in Paragraph 129 of its Order. Paragraph 129 of the Order provides:

> 129) The parents have demonstrated an overall inability or refusal to understand, retain and follow through with appropriate medical advice given to them by [A.H.'s] care givers, doctors and nurses. Specifically:
>
> a. The parents have shown an inability or refusal to properly support the child's head while holding the child.
>
> b. The parents have demonstrated an inability or refusal to or unwillingness to provide the child with tummy time, as requested.
>
> c. The parents were instructed about the normal body temperature of a

baby. However, having been so instructed, they demonstrated an overall lack of understanding about when to call the doctor and when not to. They indicated on one occasion that a body temperature of 98.2 degrees was too high. On another occasion they indicated that they need not call a doctor unless the body temperature was 103 degrees.

> d. The parents were instructed about how to properly clean [A.H.'s] eyes but would not do so as instructed.

Appellant's Appendix at 31. Parents appear to challenge subparagraphs a. through d. of Paragraph 129. We address the evidence in support of each subparagraph separately.

### 1. *Parents' inability or refusal to properly support A.H.'s head*

With respect to Parents' failure to support A.H.'s head while holding him, the record reveals that the BCMHA visitation supervisor testified that Parents "continuously" failed to provide adequate support for A.H.'s head. Transcript at 330. The visitation supervisor explained to Father that A.H. did not "have the muscles to support his own head [and] you need to do that for him until he gets older and stronger . . . ." *Id.* The supervisor also testified:

> This has been an issue that we . . . have gone over with [Parents] several times on how they need to hold their sons [sic] head and support it when they are moving him or just holding him in general and switching positions or handing him off to someone else.

*Id.*

### 2. *Parents' failure to provide A.H. with "tummy time"*

With respect to Parents' failure to provide A.H. with "tummy time," the record reveals that the BCMHA case supervisor

testified that she instructed Parents on the proper way of doing "tummy time" with supervision and that A.H.'s doctor, during A.H.'s seven or eight week check-up, gave Parents specific directions to give A.H. "tummy time" for ten minutes daily under Parents' supervision. Father got upset and said that he did not want his son to do "tummy time." The case supervisor testified that Parents have not participated in any "tummy time."

The BCMHA visitation supervisor testified that she attended a doctor's visit with Mother and A.H. where the doctor advised Mother to give A.H. "tummy time" daily "to help him strengthen his muscles." *Id.* at 347. BCMHA had also advised Parents to give A.H. "tummy time." Father said that he did not care "what the doctor said I'm not going to put my son on his belly." *Id.* at 348. Although the visitation supervisor continued to remind Parents of the importance of "tummy time," she has "not witnessed one session of tummy time." *Id.*

### 3. *Parents' failure to understand A.H.'s body temperature*

With respect to Parents' failure to understand the normal body temperature of A.H. and when it was necessary to call a doctor, the record reveals that the BCMHA case supervisor testified that she had "gone over numerous times what is a normal temperature" with Parents. *Id.* at 267. The case supervisor testified that A.H. had a "low grade temperature . . . . right around 100—99.7." *Id.* Mother discussed A.H.'s temperature over the phone with a nurse at A.H.'s doctor's office, and the nurse told Mother not to give Tylenol to A.H. "unless the temperature was at 100.3." *Id.* at 268. Mother wrote down the nurse's instructions, and the nurse specifically had Mother read the numbers back to be sure that Mother understood.

*Id.* In a later visit, A.H.'s temperature was 98.2 degrees and Parents cancelled the visit early so that A.H. "could go home to the foster parents." *Id.* When Mother called the doctor to check whether a 98.2 degree temperature was something to worry about, Mother said that the nurse advised not to worry unless the temperature was 103. *Id.* When questioned, Mother repeatedly replied that the nurse said 103, not 100.3. *Id.* The BCMHA case supervisor also testified that Parents' "concept of numbers has always confused them. It is like the time frame—I guess you would say because it is not concrete. Anything that is abstract is hard for them to understand." *Id.* at 268–269.

The BCMHA visitation supervisor testified that she had "a concern with the parents understanding of temperature. . . ." *Id.* at 357. The visitation supervisor discussed with Parents "normal temperatures . . . and fevers," and A.H.'s doctor "advised [Parents] of normal temperatures and at what temperature they need to call the doctor." *Id.* at 357, 359. On one day, A.H.'s temperature was 98.2 degrees, and Parents "said that was too high of a fever for [A.H.] to be on the road." *Id.* During one visit, Parents said "that they would not contact the doctor until the baby's temperature was 200 degrees." *Id.* at 358. The visitation supervisor testified that she "talked about it" with Parents, and then Parents "changed their mind and decided that was an unrealistic temperature." *Id.* On another occasion, Parents "said they would contact the doctor if the temperature was 103," and the visitation supervisor "verified trying to understand if that was 100.3 or 103.0 and it was 103.0 is when they would contact the doctor." *Id.*

### 4. *Parents' failure to clean A.H.'s eyes*

With respect to Parents' failure to clean A.H.'s eyes as instructed, the record re-

veals that the BCMHA visitation supervisor testified that A.H. had "clogged tear ducts which causes his eyes to puss up and become matted shut." *Id.* at 344. The visitation supervisor testified that she would clean A.H.'s eyes and tell Parents about her concern. However, Parents stated that they did not believe it until they saw it. On one day, the supervisor did not clean A.H.'s eyes and pointed the eyes out to Parents. The supervisor testified that "[w]hen that happened they decided to take [A.H.] to the doctor regarding this issue." *Id.* The supervisor also testified that the doctor advised Parents "to use a warm compress and massage [A.H.'s] tear ducts on a daily basis which they will do if I remind them but other than that they do not do it" and that she has "seen them do it maybe three or four times under [her] instruction only." *Id.* at 345–346.

Based upon our review of the record, we cannot say that the evidence does not support the trial court's findings or that the findings do not support the conclusions in Paragraph 129 of its Order.

Given the evidence and testimony presented at the fact-finding hearing, we cannot say that the trial court's findings of fact, conclusions of law, and judgment were clearly erroneous. The evidence and findings of fact were sufficient to demonstrate that A.H.'s physical condition was "seriously endangered." *See, e.g., Roark,* 551 N.E.2d at 869–872 (holding that the evidence presented at a fact-finding hearing was sufficient to support the CHINS finding); *Parker v. Monroe County Dep't of Pub. Welfare,* 533 N.E.2d 177, 179 (Ind. Ct.App.1989) (observing that the court does not have to wait until a tragedy oc-

curs in order to take action and holding that the evidence supported the conclusion that the children were CHINS).

For the foregoing reasons, we affirm the trial court's determination that A.H. was a CHINS.[4]

Affirmed.

CRONE, J., and MAY, J., concur.

---

4. Because we affirm the trial court's determination that A.H. was a CHINS based upon the evidence admitted at the fact-finding hearing, we need not address the issue raised by DCS whether the trial court abused its discretion in excluding evidence relating to Parents' prior involvement with DCS and previous CHINS adjudications involving S.H. and C.F.