## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 03 2015, 6:26 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Matthew J. Elkin
Kokomo, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
David E. Corey
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of J.A., A Child Alleged To Be In Need Of Services,

M.A., Father,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

December 3, 2015

Court of Appeals Case No. 52A02-1504-JC-281

Appeal from the Miami Circuit Court

The Honorable Timothy P. Spahr, Judge

Trial Court Cause No. 52C01-1409-JC-66

**Brown, Judge.**

[1] M.A. ("Father") appeals from the trial court's order determining that his daughter J.A. is a child in need of services ("CHINS"). Father raises one issue which we revise and restate as whether sufficient evidence supports the court's determination that J.A. is a CHINS. We affirm.

## *Facts and Procedural History*

[2] Father lived with his daughter J.A., born April 25, 1998, in Peru, Indiana. When J.A. and Father first moved to the residence in Peru in 2010 or 2011, she lived there with Father, her stepmother M., her step-siblings, C.H. and Z., and four of her biological siblings including her half-sister I.A. C.H. lived in the residence until she left for college at the end of August 2014. In September 2014, I.A. was still living in the home with J.A. and Father.

[3] In the home, circumstances were such that J.A. "messed up" or made a "little mistake," Father would "lash out and scream on the top of his lungs." Transcript at 205. Father physically struck J.A. resulting in bruises on her arms, but then that stopped after J.A. went to CPS when she was in the seventh grade, and J.A. would then just be grounded and stay in her room.

[4] On September 12, 2014, J.A. went to soccer practice after school and it was "kind of cold," and Father picked her up after practice ended. *Id.* at 192. J.A. thought they were going home, but Father drove past the road that led to their house. J.A. asked Father where they were going, but he would not tell her. J.A. became concerned, and they started fighting. Father told J.A. that her

stepmother wanted her out of the house and that others never liked her and hated her. J.A. felt worthless and became angry, upset, and confused. Father yelled at her, she yelled back, and Father told her to "get out of the car." *Id.* at 184. Father was "just like joking," but J.A. took him seriously and wanted to exit the car because she was afraid of him. She opened the door a little, and Father said "no don't 'cause there's a car coming up behind" him, believing an occupant in the car would end up calling the police. *Id.* J.A. opened the door further as Father slowed down the car a "little bit." *Id.* He did not come to a stop and was still going "[m]aybe . . . five to ten miles per hour," and J.A., who did not have shoes on at the time, jumped out of the car. *Id.* at 185. She tripped but was uninjured, and did not see Father turn around or try to come back despite the cold weather.

[5]     Stephanie Birdsall, her fiancé, and her two children were traveling around fifty-five or sixty miles per hour behind Father's vehicle, and Birdsall observed J.A. exit Father's vehicle and that J.A. was visibly upset, crying, shaking, and very scared. Birdsall exited her vehicle and asked J.A. if she wanted a ride. J.A. decided to accept because she did not know how far out of town she was and had no means of communication. When she entered the vehicle, Father sped away and did not follow Birdsall's vehicle.

[6]     J.A. cried nearly until they reached Peru. Birdsall dropped her off a few blocks away from the park in Peru and made a report to the Department of Child Services ("DCS"). J.A. started walking and eventually spoke with the police

that night and later went to the Sheriff's Department. The police told J.A. that Father was going to be arrested, and placed her with the parents of her friend.

[7] Meanwhile, Father called 911 and stated that his daughter exited his vehicle and entered another vehicle. Miami County Sheriff's Deputy Nathan Freeman spoke with Father on the phone and was confused about the report of J.A. jumping out of a vehicle and "getting into another vehicle unknown, and [Father] didn't seem concerned about it." *Id.* at 234. Father did not know who was driving the vehicle that picked up J.A., where she was going, or if she was okay, and he did not try to obtain the license plate information from the vehicle. Deputy Freeman also learned that Father did not appear "overly concerned" and "didn't seem to be upset at all." *Id.* at 234-235.

[8] Deputy Freeman met Father at his residence and observed a lack of concern or urgency to find his daughter. Father offered explanations that he was sure it was a friend that picked up J.A., but he did not know which friend and did not know the vehicle. Deputy Freeman asked him if he would be willing to go to the Sheriff's Department to speak with Detective Sergeant Michael Rogers, and Father agreed.

[9] On September 16, 2014, DCS filed a verified petition alleging that J.A. was a CHINS based upon this incident, J.A.'s expression of fear over escalating domestic violence in the home, and a current investigation of Father for sexual abuse against two of her siblings. The court held a hearing at which Father

denied the allegations.[1] That same day, the State charged Father with multiple counts of child molesting and multiple counts of sexual misconduct with a minor, alleging in part that he molested I.A., and also nineteen-year-old C.H. before she was eighteen years old. A no contact order was issued between Father and J.A.

[10] On January 7, 2015, DCS filed a verified amended petition alleging that J.A. was a CHINS based upon the previously asserted allegations and because Father was charged with the crimes of child molesting and sexual misconduct with a minor on September 16, 2014, and the alleged victims lived in the same household as J.A. during the time the alleged crimes were purported to have taken place.

[11] On February 9, 2015, the court held a fact finding hearing. During the direct examination of Detective Sergeant Rogers, the DCS attorney asked him whether criminal charges were filed as a result of his investigation, and Father's counsel objected and stated that it was "completely irrelevant as to whether or not there were any criminal charges filed." *Id.* at 247. Father's counsel also argued that "[t]he statute does not require the filing of a criminal charge, at all. Only that somebody within the house be a victim." *Id.* The court overruled the objection. The court took judicial notice of cause number 52C01-1409-FA-34,

---

[1] Mother admitted that J.A. was a CHINS.

in which Father was charged with child molesting and sexual misconduct with a minor and C.H. and I.A. were the alleged victims.

[12]  Family Case Manager Sara Stolinas ("FCM Stolinas") testified that she had not spoken with Father because it was her understanding that he was not available without counsel present and because there was nothing she could really do for him and J.A. due to the no contact order. FCM Stolinas recommended that J.A. continue therapy and that she continue her placement with the foster family because the concerns regarding placement had not been remedied. She also testified that "as far as [Father] is concerned, I need to know that I can work with [him] in order to get services going with him." *Id.* at 262. The court took the matter under advisement.

[13]  Later that month, the court entered an order adjudicating J.A. to be a CHINS. The court's order states in part:

> 4.  [J.A.] was born on April 25, 1998, and is sixteen (16) years of age.
>
> 5.  On September 12, 2014, [J.A.] lived in Father's home in Peru, Indiana. One of the other inhabitants of the home at that time was Father's daughter and [J.A.'s] half-sister, [I.A.]. In the past, [J.A.] and Father had lived in the same household as their stepsister and stepdaughter, [C.H.], too, although it does not appear that that was the case on September 12, 2014.
>
> 6.  On September 12, 2014, [J.A.] jumped from Father's vehicle during an argument between them. Father's vehicle was traveling only at the rate of five (5) or ten (10) miles per hour at the time that [J.A.] exited it. There is no indication that Father

was threatening [J.A.] at the time that she got out of the vehicle. Father told [J.A.] to get out of his vehicle and she says she took it seriously at the time, although [J.A.] also has described Father as having said it jokingly. Fortunately, [J.A.] did not fall when she exited Father's vehicle and she was not hurt in any way.

7. Another vehicle was directly behind Father's vehicle when [J.A.] got out of it. That vehicle, which had stopped behind Father's vehicle, was occupied by Stephanie Birdsall, her fiancé, and her two children. Father drove away, leaving [J.A.] by the side of the road, crying and shaking. Birdsall offered [J.A.] a ride in her vehicle. Meanwhile, Father continued driving away, never stopping to confirm whether [J.A.] was fine; to prevent [J.A.] from getting into a vehicle with Birdsall and her family, who were strangers to [J.A.] and Father; or to follow the Birdsall vehicle. He also did not seek to gather identifying information (such as a license plate number) from the Birdsall vehicle.

8. Father later reported the event to law enforcement and met with a law enforcement officer, Deputy Nate Freeman of the Miami County Sheriff's Department, in order to discuss [J.A.'s] possible whereabouts. Nevertheless, abandoning [J.A.] by the side of the road and knowingly permitting her to depart in a complete stranger's vehicle constituted both a serious lapse in judgment and a lack of supervision that seriously endangered [J.A.'s] physical condition.

9. Father was arrested for Neglect of Dependent as to [J.A.] on September 13, 2014. A No Contact Order between him and [J.A.] remains in effect. Three days later, he was also charged with two counts of Child Molesting under Indiana Code 35-42-4-3 and two counts of Sexual Misconduct with a Minor under Indiana Code 35-42-4-9, with those four counts relating to Father's stepdaughter, [C.H.], as the named victim, and one additional count of Child Molesting under Indiana Code 35-42-4-

3, that count relating to Father's daughter and [J.A.'s] half-sister, [I.A.], as the named victim.

10. The evidence adduced at the Fact-Finding Hearing shows that [J.A.'s] emotional state and conduct have been volatile at times, so much so that she previously was in counseling at Four County Counseling in 2013. Also, about a week before the September 12, 2014 incident, she struck Father during an argument over the delivery of books to the local library.

11. Additionally, [J.A.] has a very weak relationship with Mother. In fact, [J.A.] has not spent the night at Mother's home for approximately four (4) years and had not talked to Mother for about three (3) months before the September 12, 2014 incident. As a result of this CHINS proceeding, [J.A.] has been receiving counseling and [J.A.] and Mother have been participating in visitation through Reins and Rainbows, which is located in Wabash County, Indiana. As Mother acknowledged during her testimony, both she and [J.A.] can be introverts, their relationship still needs work, and the counseling at Reins and Rainbows is benefiting both of them.

12. [J.A.] clearly needs such counseling, both individually and with regard to repairing her relationship with her Mother. However, [J.A.'s] conflict with Father and her resistance toward living with Mother have been strong enough that it is unlikely that she would willingly participate in the needed counseling with Mother without the coercive intervention of the Court.

13. Sara Stolinas, a DCS caseworker who has been assigned to provide services to [J.A.], has determined that a program of informal adjustment or other family or rehabilitative services is inappropriate.

14. While Father cites to the case of *In the Matter of D.H., J.H., J.B.H., L.H. and N.H.*, 859 N.E.2d 737 (Ind. Ct. App. 2007), the Court notes that, in 2013, I.C. 31-34-1-3(b)(2) was amended by the Indiana General Assembly to add subparagraph (B). In doing so, the legislature expressed its intent that a child could be found to be a Child in Need of Services under I.C. 31-34-1-3(b), even if the criminal charges against the alleged perpetrator still are pending. That legislative change makes sense from a public policy standpoint, considering that the law has changed to require that [CHINS] proceedings typically reach a fact-finding hearing within 60 to 120 days after they are just filed – much faster than in the past and also much faster than most criminal sex offenses can reach a final disposition.

15. Mother has argued that [J.A.] cannot be a Child in Need of Services pursuant to I.C. 31-34-1-3 because she did not live with either Father or [I.A.] on the date when the CHINS Petition was filed.[2] The Court does not find that argument convincing. After all, but for the events of September 12, 2014, the DCS's resultant removal of [J.A.] approximately three days before the first CHINS Petition was filed in this case, she would still have been living in Father's home with Father and [I.A.]. CHINS Petitions are almost never filed on the exact same day as the removal of the child, and so giving force to Mother's argument would cause I.C. 31-34-1-3 to almost never be applicable – clearly a result that was not intended by the legislature.

16. In light of the charge of Child Molesting against Father as to [I.A.] and all of the other above-stated facts, the Court concludes

---

[2] The Court considers the Amended CHINS Petition to relate back to the date of filing of the original CHINS Petition.

that [J.A.] is a Child in Need of Services under both I.C. 31-34-1-1 and I.C. 31-34-1-3.

Appellant's Appendix at 16-18.

[14] On April 1, 2015, the court held a dispositional hearing. Two weeks later, the court entered a dispositional order that J.A. remain in her current placement and receive services including individual therapy at Reins and Rainbows, visitation with Mother, and family therapy with Mother. The order stated that Father would not be ordered to participate in any of the services requested by DCS so long as there is a no contact order in place through the criminal cause, and that Father does not wish to have any contact with J.A.

## Discussion

[15] The issue is whether sufficient evidence supports the court's determination that J.A. is a CHINS. In reviewing a trial court's determination that a child is in need of services, we neither reweigh the evidence nor judge the credibility of the witnesses. *In re S.D.*, 2 N.E.3d 1283, 1286-1287 (Ind. 2014), *reh'g denied*. Instead, we consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* DCS is required to prove by a preponderance of the evidence that a child is a CHINS. *In re A.H.*, 913 N.E.2d 303, 305 (Ind. Ct. App. 2009). When a court's orders contain specific findings of fact and conclusions of law, we engage in a two-tiered review. *Id.* First, we determine whether the evidence supports the findings. *Id.* Then, we determine whether the findings support the judgment. *Id.* We reverse the trial court's

judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if it is unsupported by the findings and conclusions. *Id.* When deciding whether the findings are clearly erroneous, we consider only the evidence and reasonable inferences therefrom that support the judgment. *Id.*

[16] We note that the trial court concluded that J.A. was a CHINS under both Ind. Code § 31-34-1-1 and Ind. Code § 31-34-1-3. We begin by discussing Ind. Code § 31-34-1-1 which governs the CHINS determination and provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> > (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> > (2) the child needs care, treatment, or rehabilitation that:
>
> > > (A) the child is not receiving; and
>
> > > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[17] The CHINS statute does not require a tragedy to occur before a court may intervene. *In re A.H.*, 913 N.E.2d at 306. "Rather, a child is a CHINS when he or she is endangered by parental action or inaction." *Id.* "The purpose of a

CHINS adjudication is not to punish the parents, but to protect the children."
*Id.*

[18] Father argues that any allegation under Ind. Code § 31-34-1-1 fails because there was no allegation and no findings by the court regarding this issue. He contends that the September 16, 2014 allegations did not contain reference to any serious impairment to J.A. He points to Paragraph 7 of the court's February 2015 order and says that there was no testimony that J.A. was crying or shaking by the side of the road. He points to Paragraph 8 which found in part that he abandoned J.A. by the side of the road and knowingly permitted her to depart in a stranger's vehicle, and argues that the finding contradicts the evidence and that the conclusion that he demonstrated a lack of supervision seriously endangering her physical condition was without a factual basis. He asserts that he reported his belief that J.A. entered the vehicle of a friend. He also contends that the trial court created a requirement that all parents prevent all bad acts by all children.

[19] DCS's position is that the record supports the challenged findings and that Father's arguments are a request to reweigh the evidence. DCS also argues that the coercive intervention of the court was necessary.

[20] With respect to Father's argument that there was no allegation and no findings regarding Ind. Code § 31-34-1-1, we disagree. In its petitions, DCS alleged that Father did not stop or try to ensure J.A.'s safety after she jumped from his moving vehicle and that she was given a ride back into Peru by strangers. The

court found that J.A. jumped from Father's moving vehicle after he told her to exit his vehicle, that he drove away, leaving her by the side of the road crying and shaking, that she entered Birdsall's vehicle, and that Father "continued driving away, never stopping to confirm whether [J.A.] was fine; to prevent [J.A.] from getting into a vehicle with Birdsall and her family, who were strangers to [J.A.] and Father; or to follow the Birdsall vehicle." Appellant's Appendix at 17. The court found that Father "also did not seek to gather identifying information (such as a license plate number) from the Birdsall vehicle." *Id.* The court acknowledged that Father later reported the event to law enforcement but stated that "[n]evertheless, abandoning [J.A.] by the side of the road and knowingly permitting her to depart in a complete stranger's vehicle constituted both a serious lapse in judgment and a lack of supervision that seriously endangered [J.A.'s] physical condition." *Id.*

[21] As for Father's argument that he reported his belief that J.A. entered the vehicle of a friend, we observe that Deputy Freeman testified that Father offered explanations that he was sure it was a friend that picked up J.A., but he did not know which friend and did not know the vehicle. As for Father's assertion that there was no testimony that J.A. was crying or shaking by the side of the road, Birdsall testified that J.A. exited the vehicle, started walking back towards Peru and that "she was crying and she was shaking . . . so that's when I had got out and asked her if she wanted a ride." Transcript at 219.

[22] Based upon the record, we conclude that the findings of the trial court support the conclusion that J.A.'s physical condition was seriously endangered as a

result of the inability, refusal, or neglect of Father to provide her with necessary supervision.[3]

[23] We next turn to Ind. Code § 31-34-1-3 which provides:

> (a) A child is a child in need of services if, before the child becomes eighteen (18) years of age:
>
> > (1) the child is the victim of a sex offense under:
> >
> > > \* \* \* \* \*
> > >
> > > (C) IC 35-42-4-3 [Child molesting];
> > >
> > > \* \* \* \* \*
> > >
> > > (F) IC 35-42-4-9 [Sexual misconduct with a minor];
> >
> > (2) the child needs care, treatment, or rehabilitation that:
> >
> > > (A) the child is not receiving; and
> > >
> > > (B) is unlikely to be provided or accepted without the coercive intervention of the court.

---

[3] To the extent that Father asserts there was no basis to keep J.A. from Mother, we observe that Mother conceded at the initial hearing that J.A. was a CHINS and does not appeal the court's order.

(b) A child is a child in need of services if, before the child becomes eighteen (18) years of age:

(1) the child lives in the same household as another child who is the victim of a sex offense under:

\* \* \* \* \*

(C) IC 35-42-4-3 [Child molesting];

\* \* \* \* \*

(F) IC 35-42-4-9 [Sexual misconduct with a minor];

\* \* \* \* \*

(2) the child lives in the same household as the adult who:

(A) committed the sex offense under subdivision (1) and the sex offense resulted in a conviction or a judgment under IC 31-34-11-2; or

(B) has been charged with a sex offense listed in subdivision (1) and is awaiting trial;

(3) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court; and

(4) a caseworker assigned to provide services to the child:

> (A) places the child in a program of informal adjustment or other family or rehabilitative services based upon the existence of the circumstances described in subdivisions (1) and (2) and the assigned caseworker subsequently determines further intervention is necessary; or

> (B) determines that a program of informal adjustment or other family or rehabilitative services is inappropriate.

[24] To the extent that this case requires that we interpret Ind. Code § 31-34-1-3, we observe that when interpreting a statute, we independently review a statute's meaning and apply it to the facts of the case under review. *Bolin v. Wingert*, 764 N.E.2d 201, 204 (Ind. 2002). If a statute is unambiguous, we must give the statute its clear and plain meaning. *Id.* A statute is unambiguous if it is not susceptible to more than one interpretation. *Elmer Buchta Trucking, Inc. v. Stanley*, 744 N.E.2d 939, 942 (Ind. 2001). If a statute is susceptible to multiple interpretations, we must try to ascertain the legislature's intent and interpret the statute so as to effectuate that intent. *Bolin*, 764 N.E.2d at 204. We presume the legislature intended logical application of the language used in the statute, so as to avoid unjust or absurd results. *Id.* A statute should be examined as a whole, avoiding excessive reliance upon a strict literal meaning or the selective reading of individual words. *Mayes v. Second Injury Fund*, 888 N.E.2d 773, 776 (Ind. 2008).

[25]    With respect to Father's assertion that Ind. Code § 31-34-1-3(a) requires an allegation regarding a sex offense against J.A. by Father, we agree with the State that DCS did not allege that J.A. was a victim of a sex offense.  Rather, DCS alleged that subsection (b) was the applicable subsection.

[26]    To the extent that Father argues that subsection (b)(1) requires that the State demonstrate that J.A. lived in the same household as another child who is the victim of a sex offense, the record reveals that Detective Sergeant Rogers testified that he was involved in an investigation regarding Father's family, that he interviewed J.A., C.H, and Father's wife, that I.A. was interviewed at the Child Advocacy Center, and that the State filed charges against Father for molesting C.H. and I.A.  The Appellant's Appendix contains a probable cause affidavit in which Detective Sergeant Rogers stated in part that C.H. provided recorded and sworn statements advising that Father had molested her since she was nine to ten years old and that Father would show her pornographic movies while they were having sex.  Detective Sergeant Rogers also stated that Father's wife believed Father may be molesting I.A. since C.H. went to college, that I.A. stated that she was forced to stay with Father in the bedroom and that he touches her chest and grabs her butt, and that a search of the residence revealed numerous compact discs labeled to indicate that they were adult films involving sexual activity including "Teen Anal" and "Bring 'em young."  Appellant's Appendix at 66.  The court took judicial notice of cause number 52C01-1409-FA-34, in which Father was charged with child molesting and sexual misconduct with a minor and C.H. and I.A. were the alleged victims.  We

conclude that the record contains sufficient evidence to meet the requirements of subsection (b)(1) by a preponderance of the evidence.

[27] Next, we address subsection (b)(2) which provides that the "child lives in the same household as the adult who (A) committed the sex offense under subdivision (1) and the sex offense resulted in a conviction or a judgment under IC 31-34-11-2; or (B) *has been charged with a sex offense listed in subdivision (1) and is awaiting trial . . . .*" (Emphasis added).

[28] With respect to Father's argument that J.A. did not live with him when the molesting offenses occurred because J.A. had already been removed at the time DCS amended its CHINS petition, we observe that the trial court noted that it considered the Amended CHINS petition to relate back to the date of filing of the original CHINS petition. As pointed out by the State, Ind. Trial Rule 15(C) provides that "[w]henever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." The initial petition alleged that J.A. was a CHINS based upon a current investigation of Father for sexual abuse against two of J.A.'s siblings. We conclude that the amended petition included a claim that arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading. Thus, we cannot say that the trial court

erred in finding that the amendment related back to the date of the original pleading or its conclusion that J.A. was a CHINS under Ind. Code § 31-34-1-3.[4]

### *Conclusion*

[29] For the foregoing reasons, we affirm the trial court's determination that J.A. is a CHINS.

[30] Affirmed.

Riley, J., and Altice, J., concur.

---

[4] As to Father's argument that the trial court took "judicial notice without a foundation for the charges from the alleged victim(s)," Appellant's Brief at 18, we observe that Father does not cite authority or develop a cogent argument. Consequently, this issue is waived. *See Loomis v. Ameritech Corp.*, 764 N.E.2d 658, 668 (Ind. Ct. App. 2002) (holding argument waived for failure to cite authority or provide cogent argument), *reh'g denied*, *trans. denied*.