## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 05 2016, 6:55 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Paula M. Sauer
Danville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:
A.C. (Child Alleged to be in Need of Services) and K.R. (Mother);

K.R. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

August 5, 2016

Court of Appeals Case No. 32A04-1601-JC-123

Appeal from the Hendricks Superior Court

The Honorable Karen M. Love, Judge

Trial Court Cause No. 32D03-1506-JC-57

**May, Judge.**

K.R. (Mother) appeals A.C.'s (Child's) adjudication as a Child in Need of Services (CHINS). She argues the Department of Child Services (DCS) did not present sufficient evidence to permit the adjudication. We affirm.

# Facts and Procedural History

Child was born on January 16, 2015, to Mother and H.C. (Father)[1] (collectively Parents), who are not married. On June 22, 2015, DCS responded to a report Mother walked with Child to a local gas station "in 90° heat," (App. at 36), after arguing with Father and Paternal Grandmother and indicated she had no place to go. DCS helped Mother and Child find alternate housing in a shelter that day, and Mother and Child resided there during the proceedings.

On June 25, 2015, DCS filed a petition alleging Child was a CHINS due to Parents' inability to provide for Child's basic needs. On August 12 and September 16, the juvenile court held fact-finding hearings on the CHINS petition. On November 3, 2015, the juvenile court adjudicated Child as a CHINS. On December 2, 2015, the juvenile court held a dispositional hearing and entered a dispositional order requiring Parents to participate in services and granting wardship of Child to DCS.

---

[1] Father does not appeal the CHINS adjudication.

# Discussion and Decision

[4]     A CHINS proceeding is civil in nature, so DCS must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code. *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). Ind. Code § 31-34-1-1 states:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

A CHINS adjudication "focuses on the condition of the child," and not the culpability of the parent. *In re N.E.*, 919 N.E.2d at 105. The purpose of finding a child to be a CHINS is to provide proper services for the benefit of the child, not to punish the parent. *Id.* at 106.

[5]     When a juvenile court enters findings of fact and conclusions of law in a CHINS decision, we apply a two-tiered review. *Parmeter v. Cass Cnty. DCS*, 878 N.E.2d 444, 450 (Ind. Ct. App. 2007), *reh'g denied*. We first consider whether

the evidence supports the findings and then whether the findings support the judgment. *Id*. We may not set aside the findings or judgment unless they are clearly erroneous. *Id*. Findings are clearly erroneous when the record contains no facts to support them either directly or by inference, and a judgment is clearly erroneous if it relies on an incorrect legal standard. *Id*. We give due regard to the juvenile court's ability to assess witness credibility and we do not reweigh the evidence; we instead consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Id*. We defer substantially to findings of fact, but not to conclusions of law. *Id*.

[6] Mother challenges many of the juvenile court's findings and argues DCS did not present sufficient evidence to support those findings. It did.

## I. Mother's Housing Instability

[7] Regarding Mother's housing situation, Mother argues the evidence does not support Finding 23 which states:

> 23. Mother advised [FCM] Ms[.] Ash that her father was on disability for his mental health issues. As this case has progressed Mother has never come up with another place to stay with [Child] other than with her mentally ill father in Pennsylvania or the shelter arranged by DCS. Ms[.] Ash did a back ground [sic] check on [Child's] maternal grandfather and did not believe living with him would be appropriate for [Child].

(App. at 37.) Based thereon, the juvenile court concluded Mother "did not have the ability to provide [Child] with the necessary . . . shelter." (*Id*. at 39.)

[8]   Mother claims she was "weighing various options, such as moving into independent housing with Father or moving to Pennsylvania where her family resided." (Br. of Appellant at 8.) She asserts her inability to secure housing does not, in itself, support the juvenile court's conclusion Child is a CHINS. In support of her argument, Mother cites *In re S.M.*, 45 N.E.3d 1252, 1256 (Ind. Ct. App. 2015), where we said, "[e]ven the mere fact of a family living in a shelter while seeking stable housing does not make a CHINS." However, the facts in *In re S.M.* are different from those in this case, as the children in *In re S.M.* "have always had a home[.]" *Id*. at 1254. Here, not only does Mother not have stable housing, there are other factors that support Child's adjudication as a CHINS, as will be discussed further in this opinion. Mother's argument is an invitation for us to reweigh the evidence, which we cannot do. *See Parmeter*, 878 N.E.2d at 450 (appellate court cannot reweigh evidence or judge the credibility of witnesses).

## II. *Mother's Ability to Care for Child*

[9]   Mother argues DCS did not present sufficient evidence to support the juvenile court's findings regarding Mother's ability to care for Child. The juvenile court found:

> 6.  DCS reveived [sic] two reports re: [Child]. On 6/19/15 DCS received a report alleging the parents were unable to financially care for [Child], that [Child] had not received all of her well baby checks and the parents argued a lot.

7. On 6/22/2015 DCS received a second report that Mother and [Child] were at a local gas station in 90˚ heat, they had been kicked out of their home and had no place to go.

* * * * *

9. After [Child's] birth[,] Father, Mother, and [Child] lived with [Paternal Grandmother] in her home. [Paternal Grandmother] works and she financially supported Father, Mother and [Child]. Neither parent worked prior to 6/22/2015.

* * * * *

11. FCM Ash explained why [Mother and Child] were at the gas station. Mother admitted she and [Child] had been living in [Paternal Grandmother's] home with Father, Father's brother and step father. Mother admitted that she and [Paternal Grandmother] argued, shoved each other on 6/22/2015 and Mother left with [Child] and Mother walked to the gas station with [Child], Mother admitted she and [Child] had nowhere to go. Mother had contacted her own father who lives in Pennsylvania and he could not come and get Mother and [Child].

12. Father came to the gas station and later [Paternal Grandmother] came to the gas station. Father admitted that he and Mother cannot financially take care of [Child] and that he was too depressed to actually provide hands on care for [Child]. Father and [Paternal Grandmother] were concerned that [M]other and [Child] were out in the heat.

* * * * *

16. [Paternal Grandmother] often prompted Mother to make appointment[s] with [Child's] doctor for checkups and offered to take Mother and [Child] to the appointments. Sometimes Mother followed through and [Paternal Grandmother] drove Mother and [Child] to her doctor appointments. Prior to DCS involvement [Child] had not been to all of the normal and customary "well baby check up[s]" with her doctor.

\* \* \* \* \*

28. On two separate occasions [Child] had blood on her nose which was concerning. Mother claimed she had used a QTIP [sic] to clean [Child's] nose. Mother's explanation does not make sense. It is not safe to clean an infant's nose with a QTIP [sic] to the point the infant's nose bleeds.
On another occasion [Child] had a severe diaper rash with redness and sores, and Father was very upset when [he] observed [Child's] condition during his parenting time. Father called Mother and Mother said she didn't have any wipes. Father wanted to take [Child] to the emergency room. Ms[.] Joyti [the home based case manager who supervised Father's visitation] encouraged Father to call [Child's] doctor. Father called FCM Ash and told her about [Child's] rash. [Child] was taken to the doctor [and] it [was] determined the rash was caused because [Child] was left in a saturated diaper for extended periods of time. Doctor recommended diaper be changed more frequently, use a diaper crème [sic] and changes to the baby's diet ie: [sic] no cow[']s milk. Mother had been giving the baby 2% cow's milk instead of formula.

29. FCM Ash has had multiple discussions with Mother about the proper care of [Child's] formula. On 6/22/2015, 6/23/2015, 6/24/2015, 6/30/15 and 7/1/2016 Ms[.] Ash has had to remind Mother that she must refrigerate [Child's] bottles if she makes formual [sic] ahead. Mother insists on making formula in the morning and feeding [Child] that bottle throughout the day and

leaving the bottle out in the heat. FCM Pitzer has also observed this problem and discussed the issue with Mother.

* * * * *

31. FCN [sic] Pitzer has received several emails from Father upset about Mother's lack of care for [Child]. The week prior to the fact finding hearing [Child] fell off the bed twice while in Mother's care. On 9/5/2015 FCM observed the child and did not see any marks or bruises. Mother told FCM Pitzer that [Child] fell into a pile of clothes on the floor. When Ms[.] Ptizer saw the condition of the room she was concerned [Child] could suffocate when she fell especially given Mother's admission that she was arguing with her roommate when [Child] fell.

32. FCM Pitzer has observed [Child] with diapers so full that feces were on the child's clothes. When Ms[.] Pitzer prompted Mother to change the diaper Mother merely said she had no wipes. FMC Pitzer explained to Mother that she could use a clean wash cloth to clean [Child]. FCM Pitzer has observed redness and sores on [Child] due to her Mother's lack of proper hygiene for [Child].

33. DCS has referred Mother for parenting classes and Mother is participating but her ongoing care of [Child] is not improving. Mother continues to leave the child in saturated and soiled diapers for extended periods. [Child] has re occurring [sic] sores and extreme diaper rash. Without the extensive supervision [of] FCM Ash and FCM Pitzer the diaper rash could become even worse leading to infection and could endanger [Child's] physical health.

* * * * *

37. Mother gets into arguments everywhere she goes. Mother argues with Father, with [Paternal Grandmother], and with her roommate at the shelter. Mother is focused on arguing with others[,] not on [Child]. Nothing has been accomplished despite the referrals for parenting skills for Mother and the intensive supervision by the family case managers assigned to this child. Mother has "accepted" parenting skills training but she is merely going through the motions. The coercive intervention of the court is necessary for Mother to actively engage in services in order to meet [Child's] needs.

(App. at 36-39.)

[10] Regarding these specific findings, DCS presented evidence Child had missed at least one "well baby" appointment, Mother lived with Paternal Grandmother, and Mother did not have a source of income. Mother admitted she walked with Child to a gas station near Paternal Grandmother's house on a hot day and indicated to someone therein that she did not have anywhere to go. DCS presented evidence Child had severe diaper rash on multiple occasions and the rash was observed by multiple people, the diaper rash required medical attention, and Mother admitted she did not regularly change Child's diaper, which resulted in the severe rash. DCS presented testimony indicating Mother fed Child cow's milk against the recommendation of a doctor and would mix Child's formula bottles in the morning and, without refrigerating them, feed them to Child throughout the day. Finally, DCS presented information Mother was argumentative with multiple people, often to the detriment of Child, including an incident in which Child fell from a bed into a pile of clothes while Mother argued with her roommate. Mother's alternate version of facts and

excuses for her actions are invitations for us to reweigh the evidence, which we cannot do.[2] *See Parmeter*, 878 N.E.2d at 450 (appellate court cannot reweigh evidence or judge the credibility of witnesses). The evidence in the record supports the court's findings regarding Mother's inability to care for Child. [3]

# Conclusion

[11] DCS presented sufficient evidence to support the juvenile court's findings and those findings supported its conclusion Child was a CHINS. Accordingly, we affirm.

[12] Affirmed.

Kirsch, J., and Crone, J., concur.

---

[2] Mother also contends, because the evidence does not support the findings, the juvenile court erred when it concluded Child was "seriously impaired or endangered" as a result of Mother's actions. As we determine DCS presented sufficient evidence to support the juvenile court's findings, the trial court did not err when it concluded Child was a CHINS. *See In re A.H.*, 913 N.E.2d 303, 311 (Ind. Ct. App. 2009) (holding evidence similar to the case before us, including feeding infant cow's milk, not changing infant's diaper regularly, and not taking infant to the doctor, warranted a CHINS adjudication).

[3] Mother also challenges findings regarding Father, who does not participate in this appeal. The parties are at odds regarding the issue of Mother's standing to contest findings regarding Father. As we determine DCS presented sufficient evidence independent of the findings regarding Father, we need not address the issues surrounding them.