## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Jan 28 2016, 8:34 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANTS

Jill M. Acklin
McGrath, LLC
Carmel, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of: B.C., a Child in Need of Services,

T.C. (Mother) and W.J. (Alleged Father #1),

*Appellants-Respondents*,

v.

Indiana Department of Child Services,

*Appellee-Petitioner*,

and

Child Advocates, Inc.,

*Appellee (Guardian ad Litem).*

January 28, 2016

Court of Appeals Case No. 49A02-1503-JC-147

Appeal from the Marion Superior Court

The Honorable Marilyn A. Moores, Judge
The Honorable Danielle P. Gaughan, Magistrate

Cause No. 49D09-1406-JC-1375

**Bradford, Judge.**

# Case Summary

[1] Appellants-Respondents T.C. ("Mother") and W.J. ("Alleged Father #1") appeal from the juvenile court's determination that child B.C. ("Child") is a child in need of services ("CHINS"). In June of 2014, Mother gave birth to Child. When Child was two weeks old, Mother sought assistance, indicating that she was homeless. When Mother was offered a referral to a shelter, she refused and indicated that she would obtain money for housing through prostitution. A worker with the Homeless Initiative Project ("HIP") contacted Appellee-Petitioner the Indiana Department of Child Services ("DCS") with concerns about Child's welfare.

[2] Due to concerns about Mother's housing, illegal drug use, and mental health issues, Child was removed from Mother's care and DCS filed a CHINS petition. Over the course of the next several months, Mother tested positive for marijuana several times, was diagnosed with intermittent explosive and depressive disorders, was living in an apartment paid for by Alleged Father #1, and did not have steady employment. Meanwhile, Alleged Father #1, whose paternity of Child had not yet been established, was rejected as a placement option due to concerns about the appropriateness of his home.

[3] The juvenile court conducted a fact-finding hearing over three days in October and December of 2014, after which it found Child to be a CHINS. Following a

dispositional hearing, the juvenile court continued Child's placement outside the homes of Mother and Alleged Father #1 and entered participation orders for Mother and Alleged Father #1. Alleged Father #1's participation order provided, *inter alia*, that he establish paternity of Child. In a motion to correct error, Mother and Alleged Father #1 indicated that Alleged Father #1 has executed an affidavit of paternity in June of 2014. Mother and Alleged Father #1 argue that the juvenile court abused its discretion in finding that Child's physical or mental condition was impaired or seriously endangered or that she needs care that she is not receiving. Because we conclude that the juvenile court did not abuse its discretion, we affirm.

# Facts and Procedural History

[4] On June 11, 2014, Child was born to Mother. On June 25, 2014, Mother sought help because she was homeless at the time. DCS soon became involved, which led to removal of Child from Mother's care and the filing of a CHINS petition on June 27, 2014. On October 27 and December 1 and 23, 2014, the juvenile court conducted evidentiary hearings on DCS's CHINS petition. Following the evidentiary hearings, the juvenile court found Child to be a CHINS and issued the following findings of fact, none of which are challenged by Mother or Alleged Father #1:

1. [Child] is a minor child whose date of birth is June 11, 2014.
2. The mother of [Child] is [Mother].
3. The father of [Child] is [Alleged Father #1].

4. Angela Floyd works with the Neighborhood Alliance for Child Safety (NACS). Mother signed up for the Parents as Teachers Program though NACS on June 25, 2015. Mother told Ms. Floyd that she was staying at a hotel with her baby but had run out of funds and was therefore homeless. Ms. Floyd scheduled an appointment with the Homelessness Initiative Program (HIP).

5. Jonathan Griffin is triage and outreach professional at HIP. This program[] works to make resources available to homeless individuals. Mother went to HIP with her NACS worker and her baby. Mother told Mr. Griffin that she had nowhere to go. Mr. Griffin told her they would try and find her a shelter but Mother refused, saying, "I am not going to a f[******] shelter; I will kill myself." Mother told Mr. Griffin that she would get money to pay for additional time at the hotel by prostituting herself.

6. Once Mother left HIP, she told Ms. Floyd that she did not want her services anymore. When Ms. Floyd asked where she would go, Mother told her, "it is none of your f[******] business."

7. Michel[l]e Tackett was the family case manager that was assigned to investigate the safety and welfare of [Child]. DCS became involved with the family because of reports that Mother and [Child] were homeless, that Mother admitted to marijuana use and Mother had prior DCS history.

8. Prior DCS involvement was because of marijuana use and homelessness but Mother's mental health issues also became an issue. Mother's prior DCS involvement resulted in the closure of the case with custody of the child awarded to the child's father.

9. On or about June 25, 2015 Ms. Tackett talked to Mother. At that time Mother was staying [at] a hotel and before that she was living in her cousin's home while she was pregnant. Mother said that she had been staying at a hotel recently and before that she was living at her cousin's home while she was

pregnant. Mother acknowledged meeting with the housing initiative program that day but they wanted her to stay in a shelter and she did not want to. Other than "staying with a friend" Mother had no plan as to where she would go with the baby.

10. With regard to her substance use, Mother stated that she had smoked [marijuana] the day before and twice since her daughter was born. She submitted to an oral drug swab at that time.

11. With regard to her mental health, Mother stated that she had been diagnosed with depression, had been hospitalized for it in 2013, has been prescribed medication but was not currently taking any medication.

12. Ms. Tackett also spoke with [Alleged Father #1]. [Alleged Father #1] stated that Mother was living with him but when confronted with Mother's statements about Mother staying in a hotel, [Alleged Father #1] said that she did stay in a hotel.

13. DCS did not consider placement with [Alleged Father #1] because paternity had not been established, there were conflicting statements as to whether Mother would be staying with him, and there were concerns that [Alleged Father #1]'s home was not appropriate.

14. The child was removed by DCS and a child in need of services (CHINS) was filed on or about June 27, 2014.

15. At the initial hearing regarding [Child], DCS recommended continued out of home placement. Continued out of home placement was authorized by the court and Mother was authorized to have supervised parenting time.

16. After the initial hearing, in the parking lot of the courts, Mother called Ms. Tackett a "bald-headed b[****]" and threatened to hit her.

17. Another incident that occurred outside the courtroom in the parking lot after a hearing was on October 13, 2014. Mother

approached Jonathan Griffin from HIP and Angela Floyd from NACS calling them names and yelling at them.

18. Mother submitted to drug screens on June 25, 2014, August 28, 2014, September 5, 2014 and September 13, 2014. All of the screens were positive for THC at levels that over the course of that period reflected new use.

19. Kurtis O'Brien is [] a clinical therapist though Cummings Behavioral Health and received the referral for home based therapy for Mother on July 9, 2014. The intake process was completed on July 18, 2014 and services began. During the intake process Mother had an angry outburst.

20. Mother has self-reported marijuana use to Mr. O'Brien and as recently as this morning admitted to marijuana use since the last appointment last week.

21. Mr. O'Brien and Mother have discussed her mental health and Mother has acknowledged a hospitalization due to mental health issues in 2013.

22. Mr. O'Brien has diagnosed Mother with intermittent explosive disorder and depressive disorder.

23. Mr. O'Brien has seen the one bedroom apartment that Mother lives in. [Alleged Father #1] pays for the apartment though Mother reports they are not in a relationship.

24. Although Mother has made progress in her approximately 12 sessions with Mr. O'Brien, Mother continues to need on-going therapy with Mr. O'Brien.

25. The home based case manager for Mother is Beth Oslane, from Adult and Child. Mother and Ms. Oslane meet once a week for 1 to 2 hours to address housing and employment. Mother has discussed with Ms. Oslane what she would do if [Alleged Father #1] stopped paying for her apartment. Mother, however, believes that he will always take care of her.

26. During a supervised visit in her home in September, Mother became upset and was angry about DCS and white people. She paced around the apartment and was swearing.

27. At the time of the first day of trial on December 1, 2014, Mother was working at Hardee's on the west side. By the time of the second day of trial on December 23, 2014, she no longer had that job, reporting that she quit because the people were difficult. At the time of the second day of trial, Mother was working at Amazon.

28. Erica Glenn with Children's Bureau is a foster care case manager that facilitated an exchange of the child from foster care to an unsupervised visit with [Alleged Father #1] in August 2014. [Alleged Father #1] had not properly secured [Child] in the car seat or the car seat into the car. Ms. Glen[n] did a quick tutorial on how to properly use the car seat. Also, when [Alleged Father #1] returned the child, the child's diaper had not been changed during the two hour visit. [Alleged Father #1] stated that he did not get a chance to change her diaper.

29. Richard Dark is employed by Family Works and he is a home based case manager. He received the referral at the end of August but did not make contact until September 8 or 9 of 2014. Mr. Dark assists with transportation to and from visits and observes some of the visits. [Alleged Father #1] has been cooperative but has had difficulty meeting with him because of time limitations. He is employed, trying to start his own business, and works 14 hours a day. [Alleged Father #1] has his elderly Mother living with him.

30. Richard Dark does not recommend placement with [Alleged Father #1] at this time. [Alleged Father #1] still requires supervision at his visits. The visits are scheduled once per week. Because [Alleged Father #1] does not have the time to meet with Mr. Dark once a week to discuss parenting, Mr. Dark does his best to address parenting at the beginning and end of each visit.

Appellants' App. pp. 100-04.

[5]     The juvenile court also concluded as follows:

> 31. The child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parents to supply the child with necessary food, clothing, shelter, medical care, education, or supervision. Mother has mental health issues that are currently untreated and even by her own admission, on-going marijuana use. Mother has repeated angry outbursts, characteristic of her diagnosis for intermittent explosive disorder. [Alleged Father #1] has not established paternity, does not have the time or ability to care for [Child] and has not demonstrated the ability to do so.
>
> 32. The child needs care, treatment, or rehabilitation that she is not receiving and she is unlikely to be provided or accepted without the coercive intervention of the court. Mother is uncooperative, argumentative and aggressive with providers that are trying to assist her. [Alleged Father #1] has not established paternity and has not demonstrated the ability to parent [Child].

Appellants' App. p. 104.

[6]     On January 23, 2015, the juvenile court held a dispositional hearing. DCS's counsel stated at the hearing that Mother had been testing positive for cocaine use. Following the hearing the juvenile court issued participation orders for both Mother and Alleged Father #1. The juvenile court ordered that Mother establish paternity of Child, participate in home-based therapy and case management, undergo substance abuse assessment and random drug screens,

submit to a psychological evaluation, and participate in parenting time. The juvenile court ordered that Alleged Father #1 establish paternity and participate in home-based case management.

[7] On January 28, 2015, Mother and Alleged Father #1 filed a joint motion to correct error, requesting the juvenile court reconsider its order to establish paternity on the basis that Alleged Father #1 had executed a paternity affidavit on June 16, 2014. Following a response by DCS, the juvenile court denied the motion to correct error and vacated its order for DNA testing. On June 26, 2015, the juvenile court conducted a permanency hearing, after which it issued an order granting DCS's motion to add C.P. ("Alleged Father #2") to the CHINS case. On June 29, 2015, the juvenile court ordered Mother and Alleged Father #2 to submit to DNA testing to establish Child's paternity. On July 7, 2015, Mother and Alleged Father #1 jointly moved to rescind the juvenile court's order to submit to DNA testing. On August 7, 2015, the juvenile court denied Mother and Alleged Father #1's joint motion.

# Discussion and Decision

[8] With respect to CHINS determinations, the Indiana Supreme Court has stated the following:

> [a] CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of*

*Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence that supports the [juvenile] court's decision and reasonable inferences drawn therefrom. *Id*. We reverse only upon a showing that the decision of the [juvenile] court was clearly erroneous. *Id*.

…

There are three elements DCS must prove for a juvenile court to adjudicate a child a CHINS. DCS must first prove the child is under the age of eighteen; DCS must prove one of eleven different statutory circumstances exist that would make the child a CHINS; and finally, in all cases, DCS must prove the child needs care, treatment, or rehabilitation that he or she is not receiving and that he or she is unlikely to be provided or accepted without the coercive intervention of the court. *In re N.E.*, 919 N.E.2d at 105.

*In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012) (footnote omitted).

[9] Indiana Code section 31-34-1-1, on which the juvenile court based its disposition, provides that a child is a CHINS before the child becomes eighteen years of age if:

> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and
>
> (2) the child needs care, treatment, or rehabilitation that:
>
>> (A) the child is not receiving; and
>>
>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[10] As the Indiana Supreme Court has observed,

> Juvenile law is constructed upon the foundation of the State's *parens patriae* power, rather than the adversarial nature of *corpus juris. Kent v. United States*, 383 U.S. 541, 554, 86 S. Ct. 1045, 16 L. Ed. 2d 84 (1966). Indeed, juvenile court jurisdiction "is rooted in social welfare philosophy rather than in the *corpus juris.*" *Id.* The purpose of the CHINS adjudication is to "protect the children, not punish parents." *In re N.E.*, [919 N.E.2d 102, 106 (Ind. 2010)]. The process of the CHINS proceeding focuses on "the best interests of the child, rather than guilt or innocence as in a criminal proceeding." *Id.*

*In re K.D.*, 962 N.E.2d at 1255.

[11] Mother and Alleged Father #1 argue that the juvenile court's finding that section 31-34-1-1 was satisfied constitutes an abuse of discretion because all indications were that Child appeared to be a healthy baby when removed from Mother's care. DCS, however, was not required to establish that Child had already been harmed, only that her physical or mental condition was seriously impaired or seriously endangered. "The CHINS statute … does not require that a court wait until a tragedy occurs to intervene." *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009) (citing *Roark v. Roark*, 551 N.E.2d 865, 872 (Ind. Ct. App. 1990)). "Rather, a child is a CHINS when he or she is endangered by parental action or inaction." *Id*. With this in mind, we conclude that the record contains ample evidence to support the juvenile court's disposition.

# I. Mother

[12] Mother came forward with two-week-old Child because she was homeless, and, yet, when offered a referral to a shelter, flatly refused. Whatever Mother's feelings about homeless shelters, Child would have been provided with a roof

over her head had Mother accepted the assistance offered to her. In the months that followed Child's removal, Mother showed an inability to provide stable housing. At the time of the first fact-finding hearing in October of 2014, Mother claimed that she was living in her own apartment. The apartment, however, was being paid for by Alleged Father #1. In a previous case in which Child's sibling was removed from Mother's care, Alleged Father #1 had also been paying for an apartment for Mother but stopped, resulting in Mother's homelessness. Mother did not have a plan if Alleged Father #1 stopped paying for the apartment in this case.

[13] Mother has unresolved mental health issues. Mother was hospitalized in 2013 for depression after she tried to kill herself and her aunt. Mother, however, has not been in therapy and has not taken her prescribed medication. During this CHINS case, Mother was diagnosed with intermittent explosive and depressive disorders. O'Brien, Mother's therapist, opined that Mother's explosive disorder could put Child at risk and that Mother needed ongoing therapy to address her mental health issues. Additionally, Family Case Manager Simon Galaye ("FCM Galaye") was concerned for Child's safety because Mother is unable to control her emotions and had witnessed Mother's "explosive" behavior on several occasions. Tr. p. 270. Mother frequently directed her aggressive behavior toward service providers, even having to be restrained by her attorney and Alleged Father #1 as she approached Griffin following a hearing.

[14] Mother also has unresolved substance abuse issues. Mother admitted to using marijuana regularly and tested positive for it seven times from June 25 to

October 2, 2014. The record also indicates that Mother tested positive for cocaine prior to the dispositional hearing.

[15] In summary, there is ample evidence in the record regarding Mother's unstable housing and employment situation, her unaddressed mental health issues, and her continuing substance abuse. Additionally, Mother has shown little indication that she is willing to accept the assistance she needs in order to adequately care for Child, refusing to admit that she has mental health issues in need of treatment, refusing assistance in finding housing, and frequently displaying aggressive behavior toward service providers. The juvenile court did not abuse its discretion in concluding that Mother was an unsuitable placement option for Child at this time.

## II. Alleged Father #1

[16] There is also ample evidence to support the juvenile court's conclusion that Alleged Father #1 is a not a suitable placement option for Child at this time. DCS did not want to place Child in Father's care because he resisted establishing paternity, had not progressed enough in services, and had already exhibited difficulty caring for his elderly mother. Alleged Father #1 was also working long hours such that he was unable to find time to meet with home-based case manager Dark to address parenting issues. Dark was ultimately unable to recommend placement with Alleged Father #1 due to these concerns.

[17] Moreover, while Mother and Alleged Father #1 seem to proceed as though Alleged Father #1's paternity has been conclusively established, the record

before us does not bear this out. First, although the paternity affidavit executed by Alleged Father #1 and Mother is dated June 16, 2014, the same document indicates that it was, in fact, signed and filed on July 7, 2014, ten days *after* DCS became involved and eight days after Child was removed from Mother's care. As for Alleged Father #2, he contacted the juvenile court on June 25, 2015, and indicated that he was Child's biological father. Alleged Father #2 testified at the permanency hearing that Mother told him that he was Child's biological father.

[18] The Indiana Supreme Court has observed that "there is a substantial public policy in correctly identifying parents and their offspring." *In re Paternity of S.R.I.*, 602 N.E.2d 1014, 1016 (Ind. 1992). "Proper identification of parents and child should prove to be in the best interests of the child for medical or psychological reasons." *Id*. We have held that "a biological father was entitled to file a petition to establish paternity under the Indiana Code despite the fact that the mother and a different man had executed a paternity affidavit." *In re Paternity of E.M.L.G.*, 863 N.E.2d 867, 870 (Ind. Ct. App. 2007). If it is ultimately established that Alleged Father #1 is not, in fact, Child's biological father, that would further undermine his suitability as a placement option, to say the least.

[19] In summary, doubts regarding (1) Alleged Father #1's biological relationship with Child, (2) parenting skills, (3 stated plans to secure relative daycare, and (3) willingness and availability to parent are sufficient to support the conclusion

that he is not a satisfactory placement option at this time. The juvenile court did not abuse its discretion in this regard.

# III. Whether the Juvenile Court's Coercive Intervention is Necessary

[20] Mother and Alleged Father #1 argue that even if one assumes that Mother does suffer from mental illness, the juvenile court's coercive intervention is not necessary. Although Mother did initially seek services, she did not accept the assistance that was offered and ceased those services altogether after DCS became involved. Moreover, throughout the instant case, Mother had shown considerable resistance to—and hostility toward—DCS, service providers, and the juvenile court. Finally, Mother does not acknowledge that she has substance abuse or mental health issues, so those remain unaddressed. As for Alleged Father #1, his paternity has not yet been established, and he has been unwilling or unable to make the time to take full advantage of the services offered to him. It is reasonable to expect that Alleged Father #1's interest will wane further if it is established that he is not Child's biological father. The juvenile court did not abuse its discretion in concluding that its coercive intervention was necessary in order to assure that Child receives appropriate care.

The judgment of the juvenile court is affirmed.

Baker, J., and Pyle, J., concur.