## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 17 2017, 8:50 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANTS

Carlos I. Carillo
Greenwood, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
James D. Boyer
Deputy Attorneys General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of:

L.G. (Minor Child), Child in Need of Services,

and

M.S. (Mother) & C.G. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

February 17, 2017

Court of Appeals Case No. 79A05-1607-JC-1558

Appeal from the Tippecanoe Superior Court

The Honorable Faith A. Graham, Judge

Trial Court Cause No. 79D03-1511-JC-252

**Baker, Judge.**

[1] M.S. (Mother) and C.G. (Father) appeal the trial court's order finding their child, L.G. (Child), to be a child in need of services (CHINS). Parents argue that there is insufficient evidence supporting the CHINS adjudication. They also argue that the trial court erred by denying their request for in-home placement during the CHINS case. Finding sufficient evidence and no error, we affirm.

# Facts

[2] Mother and Father are parents to two children: Child, born in March 2014, and B.G. (Sibling). Child had marijuana in her system at the time of her birth and, at the time the Department of Child Services (DCS) became involved with the family, appeared noticeably thin and small for her age.

[3] Sibling was born in March 2015. She was born three weeks prematurely and had marijuana in her system at the time of her birth. When the hospital released her after her birth, Sibling weighed six pounds. Nearly eight months later, at the time of her death, she weighed eleven pounds.

[4] On Monday, November 16, 2015, DCS received a report alleging that Sibling had died while in Parents' care and that Parents had neglected Child and Sibling. Parents stated that Sibling had died late Saturday evening or early Sunday morning, but they did not seek medical care for Sibling and did not take her body to the hospital until the morning of Monday, November 16. DCS

removed Child from Parents' care and custody that same day and placed her in foster care.

[5] A DCS investigator observed Sibling's body at the hospital. Her body appeared very small for her age and underweight, and her head appeared larger than her body. Her stomach appeared bloated, her skin looked loose, and she did not have body fat. The FCM opined that Sibling was malnourished and dehydrated.

[6] Dr. Griggs, the coroner who performed Sibling's autopsy, testified that the body was underdeveloped, poorly nourished, dehydrated, and appeared younger than seven months old. Her condition "would certainly have alerted I think a reasonable person . . . ." Tr. p. 34. He testified that medical records indicated that Sibling had last seen a physician in early May 2015 and had missed her six-month well child checkup.

[7] Dr. Griggs stated that the cause of death appeared to be asphyxia, possibly positional asphyxia (caused by a child's position while sleeping or covered with clothes, fluffy pillows, or bed clothes). The coroner further testified that because Sibling "was under developed and malnourished possibly you know would make her more likely to succumb to asphyxia . . . ." *Id.* at 49-50. In other words, her weakened condition due to dehydration and malnutrition increased her "risk generally" of succumbing to a "secondary medical problem[]" such as asphyxia. *Id.* at 50.

On November 18, 2015, DCS filed a petition alleging Child to be a CHINS. The trial court held a factfinding hearing on January 7 and February 15, 2016. On March 14, 2016, the trial court denied Parents' motion to return Child to their care, ordering Child to remain in foster care. On May 17, 2016, the trial court issued its order finding Child to be a CHINS, and on June 21, 2016, the trial court issued a dispositional decree ordering Parents to participate in reunification services and ordering Child to remain in foster care. Parents now appeal.

# Discussion and Decision

## I. CHINS Finding

## A. Standard of Review

Parents first argue that there is insufficient evidence supporting the trial court's order finding Child to be a CHINS. Our Supreme Court has explained the nature of a CHINS proceeding and appellate review of a CHINS finding as follows:

> A CHINS proceeding is a civil action; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.R.,* 919 N.E.2d 102, 105 (Ind. 2010). We neither reweigh the evidence nor judge the credibility of the witnesses. *Egly v. Blackford County Dep't of Pub. Welfare,* 592 N.E.2d 1232, 1235 (Ind. 1992). We consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* We reverse only upon a showing that the decision of the trial court was clearly erroneous. *Id.*

There are three elements DCS must prove for a juvenile court to adjudicate a child a CHINS. DCS must first prove the child is under the age of eighteen; DCS must prove one of eleven different statutory circumstances exist that would make the child a CHINS; and finally, in all cases, DCS must prove the child needs care, treatment, or rehabilitation that he or she is not receiving and that he or she is unlikely to be provided or accepted without the coercive intervention of the court. *In re N.E.,* 919 N.E.2d at 105.

*In re K.D.,* 962 N.E.2d 1249, 1253–54 (Ind. 2012) (footnote omitted).

Here, DCS alleged that the child was CHINS pursuant to Indiana Code section 31-34-1-1, which provides as follows:

A child is a child in need of services if before the child becomes eighteen (18) years of age:

(1)     the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2)     the child needs care, treatment, or rehabilitation that:

(A)     the child is not receiving; and

(B)     is unlikely to be provided or accepted without the coercive intervention of the court.

Our Supreme Court has interpreted this provision to require "three basic elements: that the parent's actions or inactions have seriously endangered the child, that the child's needs are unmet, and (perhaps most critically) that those

needs are unlikely to be met without State coercion." *In re S.D.,* 2 N.E.3d 1283, 1287 (Ind. 2014). In this case, Parents do not challenge the trial court's factual findings. Therefore, our only task is to determine whether the findings support the CHINS adjudication. *In re Guardianship of B.H.*, 770 N.E.2d 283, 288 (Ind. 2002).

# B. Sufficiency

[11] In relevant part, the trial court found as follows:

> 4.     [The DCS assessor] described [Sibling's] body as follows: (1) very small for her age, (2) underweight, (3) her head disproportionately larger than her body, (4) sunken eyes, (5) her skin already becoming a different color, (6) her body starting to lose rigor, (7) a flat spot on the back of her head with hair falling out, (8) her stomach bloated, (9) her skin appeared loose, and (10) there appeared to be no body fat.

> \*\*\*

> 7.     Dr. Griggs noted physical observations indicate [Sibling] was underdeveloped, poorly nourished, and dehydrated with wasting muscle and a fatty, widened facial appearance.

> 8.     Dr. Griggs noted that evidence of dehydration and the condition of the lower intestine indicates [Sibling] had been fed within two (2) to three (3) days prior to death.

> \*\*\*

10. Dr. Griggs opined that [Sibling's] condition could be the result of growth retardation due to poor feeding or due to poor care suggesting that a review of medical records would provide necessary insight.

***

14. Dr. Griggs stated [Sibling's] condition at the time of death should have alerted a reasonably prudent caregiver that something was wrong.

***

19. [Child] also tested positive for marijuana at birth.

20. [Child] is a noticeably thin child who is generally physically healthy and normally socialized for her age.

***

22. . . . Mother reported [Sibling] died over the weekend either late Saturday night or early Sunday morning. . . . Mother provided no explanation for the failure to call 911 for emergency medical assistance or the delay in transporting [Sibling] to the hospital other than wanting to spend more time with [Sibling] before she was taken away.

***

27. [Sibling], who was in the care of the parents, is now deceased.

28. A criminal investigation is pending.

29.     Neither parent sought immediate medical treatment for [Sibling] after discovering that [Sibling] was not breathing.

30.     Further, the parents failed to report [Sibling's] death or transport [Sibling] to the hospital for a period of at least twenty-four (24) hours up to two and one-half (2 ½) days.

31.     The manner of [Sibling's] death remains unknown.

32.     The Court is not required to wait until [Child] suffers a similar harm before intervening.

Appellants' App. Vol. II p. 76-78.

[12]     Parents focus their argument on the fact that there is no evidence in the record establishing that Child (as opposed to Sibling) had been neglected or abused by Parents. Essentially, they contend that Sibling's death was accidental, they were not at fault, and Sibling's death should not be the basis for Child's CHINS adjudication. The trial court found that, while the precise cause of Sibling's death is unknown, the evidence established that she was severely malnourished and dehydrated and that her condition should have caused a reasonable caregiver to know that something was wrong. Parents, however, did not seek medical care for Sibling, missing a regular checkup for the premature and underdeveloped infant and failing to call 911 when they noticed she was not breathing. Nearly eight months after her birth, she weighed just eleven pounds. And as Dr. Griggs testified, because Parents had failed to provide proper nutrition and hydration to Sibling, she was more susceptible to asphyxiation because of her severely weakened condition.

[13]    Parents direct our attention to two cases that are readily distinguishable from the case before us. In *In re T.H.*, this Court reversed a CHINS adjudication that stemmed from the fact that the father had an unsecured firearm in the home. 856 N.E.2d 1247, 1249 (Ind. Ct. App. 2006). At the time of the CHINS adjudication, the firearm issue had been rectified and was therefore an improper basis for a CHINS adjudication. *Id.* at 1251. In *R.S. v. Indiana Department of Child Services*, we reversed a CHINS adjudication that was based solely on a mother's prior care of her former children, to whom the juvenile court had previously terminated the mother's parental rights. 987 N.E.2d 155, 157 (Ind. Ct. App. 2013). We found that the mother's past actions in those regards were not applicable to her subsequently born child because those conditions no longer existed. *Id.* at 159.

[14]    Here, in contrast, we cannot say that the issue of Sibling's death had been "rectified," or no longer existed, at the time of the CHINS adjudication. The death of a child cannot so easily be swept under the rug and left in the past. Parents are facing an ongoing criminal investigation as a result of Sibling's death. Moreover, the trial court reasonably concluded that Parents' neglect of Sibling places Child at an ongoing risk of harm. Therefore, we are not persuaded by the above, strikingly different, cases.

[15]    Whether or not Sibling's death was intentional, the trial court's findings readily support a conclusion that she was neglected by Parents and that their neglect at least played a role in her death. Given this conclusion, it was eminently reasonable for the trial court to conclude that Child is at serious risk of harm

and is in need of coercive state intervention to safeguard her health and well-being. It is well established that a trial court considering a CHINS petition does not have to wait until a tragedy occurs to intervene. *E.g.*, *In re A.H.*, 913 N.E.2d 303, 305 (Ind. Ct. App. 2009). Here, the trial court did not err by adjudicating Child to be a CHINS to avoid another tragedy occurring in this family.

[16] Parents' remaining arguments amount to requests that we reweigh evidence and re-assess witness credibility, which we decline to do. We find the evidence sufficient to support the order finding Child to be a CHINS.

## II. Placement

[17] Finally, Parents argue that the trial court erred by denying their repeated requests that Child be placed in their care and custody during the course of the CHINS case. When the trial court enters a dispositional decree following a CHINS adjudication, it has many available options, including an order authorizing that the child be removed from her parents' care and custody and placed in another home. Ind. Code § 31-34-20-1(a)(3). In considering the contents of the dispositional decree, the trial court must abide by the following statute:

> If consistent with the safety of the community and the best interest of the child, the juvenile court shall enter a dispositional decree that:
>
> (1) is:
>
> (A) in the least restrictive (most family like) and most appropriate setting available; and

    (B)    close to the parents' home, consistent with
           the best interest and special needs of the
           child;

(2)    least interferes with family autonomy;

(3)    is least disruptive of family life;

(4)    imposes the least restraint on the freedom of the
       child and the child's parent, guardian, or custodian;
       and

(5)    provides a reasonable opportunity for participation
       by the child's parent, guardian, or custodian.

I.C. § 31-34-19-6. By virtue of its ability to determine placement of the child, the trial court has exclusive jurisdiction over custody decisions until the parties are either discharged or the cause is transferred. *E.R. v. Marion Cnty. Office of Family & Children*, 729 N.E.2d 1052, 1060 (Ind. Ct. App. 2000). The trial court must review the placement decision at least once every six months. I.C. § 31-34-21-2. Placement decisions are continuing in nature, subject to change while the CHINS proceedings are pending, and do not finally determine placement of the child. *E.R.*, 729 N.E.2d at 1059-60. The trial court's formal determinations regarding placement are reviewable by this Court.[1] *Id.* at 1060.

[18]    Here, as noted above, at the time of Sibling's death, she was extremely dehydrated and malnourished. Her condition was such that a normal caregiver

---

[1] It may be the case that to perfect an appeal of a CHINS court's placement decisions, a parent is required to bring an interlocutory appeal. *E.R.*, 729 N.E.2d at 1060. Notwithstanding the fact that the case at hand is not a perfected interlocutory appeal, we will address the important issue of placement.

would have known something was wrong, but Parents not only missed a regular well child checkup, they also failed to seek medical attention when they realized she was not breathing. They then waited at least twenty-four hours before taking her to the hospital.

[19] The trial court found, correctly, that it was "not required to wait until [Child] suffers a similar harm before intervening." Appellants' App. Vol. II p. 78. Both DCS and the Court Appointed Special Advocate supported Child's continuing placement outside of Parents' care and custody because of the circumstances of Sibling's death and the ongoing criminal investigation. Indiana Code section 31-34-19-6 makes the best interest of the child the trial court's paramount consideration in determining placement. In this case, the trial court found that Child's best interests will be best served with out-of-home placement; but it also ordered increased supervised visits occurring in Parents' home and daily monitoring, followed by a trial home visit and eventual placement back in the home if all is going well. Given the evidence in the record, we cannot say that the trial court erred by determining that it was in Child's best interests to be placed outside of Parents' care and custody until the situation can be further assessed and monitored.

[20] The judgment of the trial court is affirmed.

Mathias, J., and Pyle, J., concur.