## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jan 21 2020, 8:51 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Katherine N. Worman
Evansville, Indiana

ATTORNEYS FOR APPELLEE:

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of J.J. and K.M., (Minor Children), Children in Need of Services,

and

L.J. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

January 21, 2020

Court of Appeals Case No. 19A-JC-1625

Appeal from the Vanderburgh Superior Court

The Honorable Brett J. Niemeier, Judge
The Honorable Beverly Corn, Referee

Trial Court Cause No.
82D04-1901-JC-189
82D04-1902-JC-252

**Tavitas, Judge.**

# Case Summary

L.J. ("Mother") appeals the trial court's order adjudicating Mother's two minor children, J.J. and K.M. (the "Children"), as children in need of services ("CHINS"). We affirm.

# Issue

Mother raises one issue, which we restate as whether sufficient evidence supports the adjudication of the Children as CHINS.

# Facts

Mother is the parent of J.J. (born November 2005) and K.M. (born September 2008). J.J.'s father is B.T., and K.M.'s father is believed to be J.M.[1]

On January 28, 2019, the Vanderburgh County Office of the Department of Child Services ("DCS") received a report of neglect regarding then-thirteen-year-old J.J., who was in B.T.'s care. That day, the temperature was below 32 degrees Fahrenheit. DCS investigators located B.T. and J.J. in a cold, abandoned house in Evansville. The house was "very cluttered," unsanitary, and unsafe; "boxes [were] piled pretty high [to] the ceiling with trash"; and the house lacked adequate food, with only a ham and a jar of peanut butter on the

---

[1] Neither father is a party to this appeal.

floor. There were no blankets, running water, or electricity in the house. Tr. Vol. II p. 36. B.T. used a generator, drew electricity from a neighboring house via an extension cord, and used a kerosene heater that was stored near cardboard boxes in the house. The house smelled of kerosene, animal waste, and urine. Blood droplets and dog feces were scattered on the floor of the house, which contained two urine-stained mattresses. Investigators observed several safety hazards, including doors that hung loosely from their hinges and nails on the floor. B.T. also kept three medium-sized dogs in the house. Although J.J. was found in the house, B.T. insisted that J.J. did not live in the house. B.T. refused to allow the house to be photographed.

[5] DCS deemed B.T.'s house to be uninhabitable. J.J. was placed into foster care after DCS was unable to reach Mother or to find another suitable guardian. At the time of detention, J.J. did not have a winter coat and had not bathed in days. B.T. was subsequently arrested for child neglect based on the condition of the house and for outstanding warrants.

[6] At the time of J.J.'s removal, Mother shared custody of J.J. with B.T.; however, Mother had not seen J.J. since June 2018. In detention, J.J. advised family case manager ("FCM") Sarah Eckels that: (1) J.J. preferred a foster care placement over a placement with Mother; (2) J.J. previously found drug paraphernalia at Mother's home, and Mother "used drugs in front of him before"; and (3) an ongoing domestic violence issue existed in Mother's relationship with her boyfriend, M.R. *Id*. at 40.

[7] On January 29, 2019, the day after J.J. was removed, Mother contacted DCS and invited investigators to inspect M.R.'s home. Mother was living with M.R., Mother's other child, K.M., and M.R.'s minor children. Although Mother appeared to spend considerable time at M.R.'s home, Mother also maintained a separate apartment.

[8] On January 30, 2019, DCS filed a petition alleging that J.J. was a CHINS. That same day, FCM Taylor Maurer went to M.R.'s home. FCM Maurer advised Mother that J.J. was in foster care; recited the pending allegations regarding J.J.; and informed Mother that, as to K.M., DCS was now investigating allegations of domestic violence in Mother's relationship with M.R. and substance abuse by Mother. Mother denied FCM Maurer entry, refused to submit to a drug screen, and told FCM Maurer: "kiss my a**" and "[f]*** you." *Id.* at 46; Appellant's App. Vol. II p. 134.

[9] At a hearing on January 30, 2019, DCS filed a motion to control Mother's conduct because Mother actively evaded DCS's efforts to administer drug screens to her. The trial court granted DCS's motion. Immediately after the hearing, FCM Maurer—armed with the trial court's order—asked Mother to submit to a drug screen. Mother repeatedly refused in vulgar terms. The trial court permitted Mother to leave the court premises so that Mother could "calm down and [ ] proceed another day." Tr. Vol. II p. 46.

[10] The next day, January 31, 2019, the trial court conducted the detention hearing regarding J.J. during which the following exchange occurred between the trial court and Mother:

> [] COURT: Alright. The State needs to - because of what happened with [J.J.] and the circumstances are up in the air, they [DCS] need to look at both parents. The State's asking that I order that you cooperate with their efforts to look at the circumstances of your other child. So they're going to want to look at your home. They're going to want to talk to [K.M.]. Do you have any problem cooperating with them?
>
> [ ] MOTHER: No, they can go talk to [K.M.] at school and they can go (indiscernible) my apartment.
>
> [ ] COURT: Now, just so you know, based on what [J.J.] has reported to the Department, they're also going to be asking you about substance abuse, possibly asking that you cooperate with a random drug screen, do you have any problem with that?
>
> [ ] MOTHER: No, I do not.
>
> [ ] COURT: They're not necessarily going to make an appointment with you, but they'll probably be knocking on your door. And I just want to make sure I'm understanding correctly that you will cooperate with their efforts?
>
> [ ] MOTHER: If I'm being ordered to, then yes. But if not, [ ] no.

*Id*. at 12-13. The trial court ordered Mother, in no uncertain terms, to comply with DCS's investigation and also ordered that J.J. should remain in foster care.

[11] On February 1, 2019, FCMs Maurer and Krizsovensky[2] attempted again to conduct a home inspection at M.R.'s house. When FCMs Maurer and Krizsovensky were unsuccessful in gaining entry, they called law enforcement officers to assist. The officers suspected that occupants were inside the house but would not answer the door. While FCMs Maurer and Krizsovensky waited outside, Mother texted FCM Maurer, "Can I f****** help you?"; and "LOL, whatever. I am out of town." *Id*. at 47. Mother subsequently denied that she was at home on the date of this visit. Mother claimed that she observed FCMs Maurer and Krizsovensky remotely via video surveillance from her cell phone. M.R. later refuted Mother's claim that M.R.'s home was equipped with surveillance cameras.

[12] FCMs Maurer and Krizsovensky subsequently went to Mother's apartment, but no one answered the door. The leasing staff at the apartment complex advised that, although Mother leased the apartment, it was not her primary residence.

[13] On February 4, 2019, FCM Maurer detained K.M. at K.M.'s school,[3] and K.M. was placed into foster care. At the time of K.M.'s removal, K.M. had head lice. K.M. reported to DCS that Mother abused drugs and that a domestic violence issue existed in Mother's and M.R.'s relationship.

---

[2] FCM Krizsovensky's first name does not appear in the record.

[3] FCM Maurer simultaneously detained M.R.'s daughters, R.R. and V.R., and filed CHINS petitions regarding M.R.'s children.

[14] On February 6, 2019, DCS filed a petition in which it alleged that K.M. was a CHINS and, regarding J.J., advised the trial court that Mother was not cooperating with DCS. The next day, the trial court conducted a detention hearing regarding K.M. The trial court conducted a fact-finding hearing regarding the Children on April 25, 2019. Witnesses testified to the foregoing facts.

[15] FCM Maurer also testified that: (1) DCS coordinated supervised visitation for Mother, J.J., and K.M.; (2) Mother did not schedule or attend any visits; (3) Mother did not contact FCM Maurer to inquire about the Children's wellbeing; (4) FCM Maurer had still not gained access to or inspected Mother's apartment at the time of the fact-finding hearing; and (5) Mother admitted to having untreated bipolar disorder. FCM Maurer testified that Mother submitted to some drug tests, and DCS substantiated the allegations of domestic violence between M.R. and Mother.[4]

[16] FCM Michael Clark testified that Mother failed to participate in supervised visits coordinated through service provider Lifeline and showed little to no interest in the Children's wellbeing. Regarding the basis for DCS's CHINS petition, FCM Clark further testified:

---

[4] M.R. reported, and K.M. and R.R. corroborated, that Mother struck M.R. and gave him a black eye. M.R. "agreed to kick [Mother] out of the home and find appropriate care givers for his children." Tr. Vol. II p. 53.

Q       As far as the case goes, it's not just strictly based upon
what the kids have said, is that correct?

A       In my opinion, correct.

Q       It's based upon interactions with the parents —

A       Yes, being able to ensure safety of the children.  When we
have a report and we cannot determine safety, when a parent
doesn't want to participate in drug screens, when a parent doesn't
want to participate in services, or even engage with us, then we
have no way of knowing.  If we can't get into the home we don't
know what's safe, what's not safe.

Q       Is it typical to have parents that even if they won't engage
in other services that they refuse to participate in visitation with
their children?

A       It's not typical, no.  It does happen, but generally the
parents want to visit with the children.

Q       The Mother hasn't visited with the children and she hasn't
called to ask how they're doing?

A       That's correct.

*Id*. at 78-79.

[17]    At the close of the fact-finding hearing, the trial court ordered Mother to

comply with random drug screens.  The trial court conducted another hearing

on June 19, 2019.  DCS advised the trial court that Mother still had not

participated in supervised visitation and consistently "no-call, no-showed" for court-ordered random drug screens.

[18] On July 3, 2019, the trial court conducted a hearing and, again, ordered Mother's cooperation with random drug screens. During the hearing, Mother stated to the trial court, "I wasn't involved in this [child neglect]. This had nothing to do with me." Tr. Vol. II p. 92. The trial court replied: "They are your children so it does have something to do with you, ma'am." *Id.*

[19] That same day, the trial court also issued its findings of fact and conclusions thereon, wherein it found: (1) the Children's "physical or mental health is seriously endangered by the inability of the parents to provide the child with necessary food, shelter, education or supervision pursuant to I.C. 31-34-1-1"; (2) the Child[ren] are "in need of care, treatment, or rehabilitation which [the Children are] unlikely to receive without coercive intervention of the Court"; and (3) the Children were, thus, CHINS. Appellant's App. Vol. II p. 50. The trial court entered its dispositional order on August 6, 2019. Mother now appeals.

## Analysis

[20] Mother argues that the evidence is insufficient to conclude that the Children are CHINS. CHINS proceedings are civil actions; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *In re N.E.*, 919 N.E.2d 102, 105 (Ind. 2010). On review, we neither reweigh the evidence nor judge the credibility of the witnesses. *In re*

*K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's CHINS petition. In reviewing findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings; and second, we determine whether the findings support the judgment. *In re I.A.,* 934 N.E.2d 1127, 1132 (Ind. 2010). We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[21] For a juvenile court to adjudicate a child as a CHINS, DCS must prove three elements. *K.D.*, 962 N.E.2d at 1253. DCS must prove: (1) the child is under the age of eighteen; (2) one of eleven different statutory circumstances exist that would make the child a CHINS; and (3) the child needs care, treatment, or rehabilitation that he or she is not receiving and is unlikely to be provided or accepted without the coercive intervention of the court. *Id.*

[22] In this case, DCS alleged the Children were CHINS for reasons of neglect, as defined in Indiana Code Section 31-34-1-1. The statute provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the

child with necessary food, clothing, shelter, medical care, education, or supervision:

> (A) when the parent, guardian, or custodian is financially able to do so; or

> (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and

(2) the child needs care, treatment, or rehabilitation that:

> (A) the child is not receiving; and

> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

[23] "[T]he purpose of a CHINS adjudication is to protect children, not [to] punish parents." *N.E.*, 919 N.E.2d at 106. A CHINS adjudication is not a determination of parental fault but rather is a determination that a child is in need of services and is unlikely to receive those services without intervention of the court. *Id.* at 105. "A CHINS adjudication focuses on the condition of the child . . . . [*T*]*he acts or omissions of one parent can cause a condition that creates the need for court intervention.*" *Id.* (citations omitted) (emphasis added).

### *A. Endangerment*

[24] Mother challenges the trial court's conclusions as not supported by its findings. Specifically, Mother argues that: (1) the trial court "disregard[ed] the fact that the parents were no longer together"; (2) DCS presented no evidence that

Mother failed to protect J.J.; (3) there was no evidence that Mother was engaged in "ongoing drug use" at the time of the fact-finding hearing, that she used drugs in the presence of K.M., or that "any drug usage impaired Mother's ability to care for the children or threatened the children's safety"; and (4) "[t]here was no evidence the [C]hildren's physical or mental condition was seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the Mother to supply the children with the necessary food, clothing, shelter, medical care, education, or supervision[.]" Mother's Br. pp. 10, 12, 14, 15.

[25] Indiana Code Section 31-34-1-1(1) provides, in part, that DCS must prove:

> the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; . . . .

A juvenile court need not wait until a tragedy occurs before adjudicating a Child a CHINS. *In re R.S.*, 987 N.E.2d 155, 158 (Ind. Ct. App. 2013). Rather, a child is a CHINS when he or she is endangered by parental action or inaction. *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009).

[26] The gist of Mother's argument appears to be that any neglect by failure to meet J.J.'s basic needs occurred on B.T.'s watch. "A CHINS proceeding focuses on the best interests of the children, not the 'guilt or innocence' of either parent." *M.P. v. Ind. Dep't of Child Servs. (In re D.P.)*, 72 N.E.3d 976, 980 (Ind. Ct. App.

2017). "Because a CHINS determination regards the status of the child, a separate analysis as to each parent is not required in the CHINS determination stage." *N.L. v. Ind. Dep't of Child Servs. (In re N.E.)*, 919 N.E.2d 102, 106 (Ind. 2010). Indeed, "the conduct of one parent can be enough for a child to be adjudicated a CHINS," as "the acts or omissions of one parent can cause a condition that creates the need for court intervention." *Id.* at 105.

[27] Here, DCS presented evidence that, at the time of J.J.'s removal in January 2019, Mother had not contacted J.J. since June 2018. During Mother's extended absence, J.J. was in B.T.'s custody and lived with B.T. in an abandoned house, in unsanitary and unsafe conditions, and without adequate food, warm clothing, heat, electricity, or running water. Additionally, DCS presented evidence that, at the time of J.J.'s removal: (1) J.J. had not bathed in three days; (2) his only available bed in B.T.'s house was a urine-stained mattress on the floor of B.T.'s house; and (3) despite the extreme cold, J.J. did not own a winter coat, layered short and long trousers for warmth on his walk to school, and lived with B.T. in a house that was heated either by a kerosene heater or by running an extension cord from a neighbor's house. B.T.'s actions and omissions regarding the conditions of his house are, standing alone, sufficient to support a CHINS finding regarding J.J. *See id*.

[28] As to K.M., DCS had legitimate concerns regarding Mother's alleged substance abuse and domestic violence in Mother's relationship with M.R. DCS presented evidence that, after J.J.'s removal, Mother interfered with DCS's access to K.M. such that DCS eventually detained K.M. at school. At the time

of K.M.'s detention, K.M. had head lice.  Throughout the pendency of the matter involving K.M., Mother repeatedly refused to comply with DCS's drug screens and, in so doing, violated multiple orders of the trial court, including a granted motion to control Mother's conduct.  DCS presented evidence that Mother sought to evade drug testing and shaved her head after Mother indicated, by counsel, that Mother would submit to drug tests.  *See* Tr. Vol. II p. 75 (". . . [H]er attorney said Mother would willingly participate in a drug screen.  But at that time [Mother] had shave[d] her head so we typically do not do a drug screen when there's no hair to take the sample from.").  As of the fact-finding hearing, Mother had yet to submit to drug testing.  Further, DCS presented evidence that M.R. corroborated the allegations of domestic violence in M.R.'s and Mother's relationship.  *See id.* at 53.  Substantiated allegations of domestic violence and Mother's evasiveness regarding alleged substance abuse are sufficient to support a CHINS finding as to K.M.

[29] The foregoing facts amply support the trial court's finding that the Children's physical condition was seriously endangered.  The trial court's finding is not clearly erroneous.

### B. Necessity of Coercive Intervention of the Court

[30] Mother also argues that "[t]here was no evidence Mother's children needed care, treatment, or rehabilitation that the children were unlikely to receive without the coercive intervention of the court" or that Mother was "not willing to participate in necessary recommended services[.]"  Mother's Br. pp. 10, 16.

[31]     Pursuant to Indiana Code Section 31-34-1-1(2), DCS must prove:

the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

[32]     DCS presented evidence that Mother repeatedly defied the trial court's orders regarding random drug screens and refused to participate in supervised visitation.  As of the timing of the fact-finding hearing, DCS officials still had not gained entry to Mother's home for purposes of conducting a home inspection because Mother repeatedly thwarted DCS's efforts to inspect the living conditions in Mother's home.  As FCM Clark testified, Mother's conduct rendered DCS unable to verify that her housing conditions were adequate for the Children.  *See* Tr. Vol. II pp. 78-79 ("When we have a report and we cannot determine safety, when a parent doesn't want to participate in drug screens, when a parent doesn't want to participate in services, or even engage with us, then we have no way of knowing.  If we can't get into the home[,] we don't know what's safe, what's not safe.").

[33]     Based on the foregoing, we conclude that the record supports the trial court's finding that, without court intervention, Mother would not participate in recommended services.  Mother's argument to the contrary is merely a request that we reweigh the evidence, which we cannot do.  DCS presented sufficient evidence that the Children need care, treatment, or rehabilitation that they are

not receiving and that is unlikely to be provided or accepted without the coercive intervention of the trial court. We find no clear error.

## Conclusion

[34] Sufficient evidence supports the trial court's determination that the Children are CHINS. We affirm.

[35] Affirmed.

Najam, J., and Vaidik, J., concur.