## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

May 31 2019, 9:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kyle D. Gobel
Collier Gobel Homann LLC
Crawfordsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Erik J. Bryant
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of: A.M. and J.M., Minor Children,

D.M., Father,

*Appellant*,

v.

The Indiana Department of Child Services,

*Appellee*.

May 31, 2019

Court of Appeals Case No.
18A-JC-3015

Appeal from the Montgomery Circuit Court

The Honorable Harry Siamas, Judge

Trial Court Cause Nos.
54C01-1808-JC-223
54C01-1808-JC-224

**Brown, Judge.**

[1] D.M. ("Father") appeals the trial court's order determining that A.M. and J.M. are children in need of services ("CHINS"). Father raises one issue which we revise and restate as whether the evidence is sufficient to support the court's determination. We affirm.

*Facts and Procedural History*

[2] A.M. who was born in May 2008 and J.M. who was born in March 2012 are the children of Father and S.M. ("Mother"). The court entered a decree of dissolution in April 2014 which dissolved the marriage of Father and Mother and ordered that Father have sole custody of the children and Mother have supervised visitation.

[3] On August 6, 2018, the Department of Child Services ("DCS") filed petitions alleging the children were CHINS. The petitions alleged in part that DCS received a report on August 3, 2018, the children were homeless and Father was using methamphetamine, the family had been the subject of two prior reports in 2018 and nineteen reports since 2010, and the children were found living in a tent in the backyard of a family friend, R.J., who said she was the only person feeding the children. They further alleged Father's whereabouts on August 3, 2018, were unknown, DCS made several attempts to contact him, Mother stated that Father physically assaulted her on August 2, 2018, and a family case manager observed bruises on Mother. According to the petitions, A.M. said Mother and Father were in a fight and Father accidentally hit him, J.M. said that Father punched him on the leg, while staying in a tent at their

grandmother's yard the children were not allowed to go into the home to shower, Father stated Mother abuses prescription pills or is using methamphetamine and should not be around the children but that he had been allowing her around them anyway, and Mother failed a drug screen for methamphetamine. The children were removed with the assistance of law enforcement.

[4] In September 2018, DCS filed a petition to introduce statements made by the children. On October 3, 2018, the court entered an order that the children's statements may be introduced and admitted into evidence at the factfinding hearing. On October 4, 2018, the court held the CHINS factfinding hearing at which DCS presented the testimony of R.J., DCS assessor Zoey Rowe, and family case managers Melinda Tyler ("FCM Tyler") and Charlene Colley ("FCM Colley"). Father testified that he had not used drugs in the past two years and had never used methamphetamine. He indicated that he moved to R.J.'s sometime in mid-July, and when asked how long he had been living there before DCS came and removed the children, he answered "[p]robably for about two weeks." *Id*. at 76. He testified that he stayed in the tent and that they all had access to the shower, bathrooms, and food. When asked where he had been living previously, Father indicated his mother's house and testified that he had a tent in her yard, that he slept in it a lot of times but not all of the time, and that the children slept inside and had everything they needed at the house including a shower and food. Father also indicated that he had a pending charge for theft as a level 6 felony.

On October 19, 2018, the court entered an Order on Fact Finding Hearing which found the children were CHINS and made the following findings of fact:

> 1. Father took the children to [R.J.'s] home to live in a tent for 2 weeks; [R.J.] was a complete stranger to the children.
>
> 2. Both children witnessed domestic violence between [Mother] and [Father].
>
> 3. Mother stated [Father] beat her.
>
> 4. Mother used drugs and was under the influence.
>
> 5. Mother is the non-custodial parent; and [Father] allowed her around the children knowing she was using drugs and under the influence of drugs.
>
> 6. [A.M.] was accidently struck in the nose by [Father] during a domestic violence incident between [Mother] and [Father].
>
> 7. Father has hit [J.M.] on the leg.
>
> 8. The children witnessing domestic violence is traumatic to them and causes them harm.
>
> 9. When DCS interviewed [A.M.], he was not appropriately dressed.
>
> 10. Due to [Father's] mistrust of the DCS, he has refused to cooperate with the DCS.

Appellant's Appendix Volume 2 at 42-43. The court subsequently issued a dispositional order.

## Discussion

The issue is whether sufficient evidence supports the trial court's determination that the children are CHINS. Father argues that the court's findings that the

children were living in a tent, that Mother stated that he beat her, and that he allowed her to be around the children when she was under the influence were clearly erroneous. He argues that Mother was incarcerated at the time of the factfinding hearing, Mother's addiction issues did not endanger the children, and the findings regarding the domestic incidents, A.M.'s attire, and his decision to decline services do not rise to the level necessary to support a CHINS adjudication. The State responds that the record supports the challenged findings and the court's adjudication is not clearly erroneous.

[7] In reviewing a trial court's determination that a child is in need of services, we neither reweigh the evidence nor judge the credibility of witnesses. *In re S.D.*, 2 N.E.3d 1283, 1286-1287 (Ind. 2014), *reh'g denied.* Instead, we consider only the evidence that supports the trial court's decision and reasonable inferences drawn therefrom. *Id.* at 1287. As to issues covered by findings, we apply the two-tiered standard of whether the evidence supports the findings and whether the findings support the judgment. *Id.* We review remaining issues under the general judgment standard, under which a judgment will be affirmed if it can be sustained on any legal theory supported by the evidence. *Id.*

[8] Ind. Code § 31-34-1-1 provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
>> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or

custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision; and

(2) the child needs care, treatment, or rehabilitation that:

(A) the child is not receiving; and

(B) is unlikely to be provided or accepted without the coercive intervention of the court.

The CHINS statute does not require that a court wait until a tragedy occurs to intervene. *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009). Rather, a child is a CHINS when he or she is endangered by parental action or inaction. *Id*. A CHINS determination establishes the status of a child alone. *In re N.E.*, 919 N.E.2d 102, 106 (Ind. 2010). Because a CHINS determination regards the status of the child, a separate analysis as to each parent is not required in the CHINS determination stage. *Id*. The conduct of one parent can be enough for a child to be adjudicated a CHINS. *Id.* The purpose of a CHINS adjudication is to protect children, not punish parents. *Id*. The resolution of a juvenile proceeding focuses on the best interests of the child, rather than guilt or innocence as in a criminal proceeding. *Id*.

[9] The record reveals that R.J. testified that, in July 2018, Mother asked her if Father and the children could camp in her backyard for a few days and that she met the children when they came to stay with her. She indicated that she had met Mother approximately eighteen months earlier at the house of an acquaintance, and had been in jail with her. She testified that J.M. stayed in the tent with Father most of the time and that a lot of times A.M. stayed with

her. When asked "[s]o [J.M.] stayed with his dad in the tent and [A.M.] stayed with you many times," she replied "[y]eah, a few times. They were only there three to five days, but [A.M.] stayed inside the majority of the time." Transcript Volume II at 36. She testified that she fed them and Father did not provide her with any food or money to feed them. When asked if Father said where he was going with J.M. when he would leave, she answered "[h]e would go scrap or whatever." *Id.* at 37. She indicated that Mother came to her home a couple of times during that period and that Mother and Father had left the day before DCS removed the children and the children had stayed overnight with her. She indicated the children were able to enter her house and shower when they wanted and that she had not met Father before he moved into her yard.

[10] Rowe, the DCS assessor, testified that she drove around Crawfordsville on August 3rd looking for Mother because no one could find her and that Mother was found at an apartment and appeared to be under the influence. According to Rowe, Mother said that she had relapsed and that Father had beat her the previous day, and she appeared to have fresh marks and bruises on her arms and legs.

[11] FCM Tyler testified that she received a report of domestic violence on June 29, 2018, and made contact with Father who declined to allow her to interview the children. She testified she received another report on July 6th that Mother was on methamphetamine. She indicated that she reached out to the paternal grandmother, who informed her that the children were living in a tent in the

woods with Father. According to FCM Tyler, Mother met with her at the probation department in mid-July and stated she saw the children at least twice a week, that she was able to interact with them, and that Father knew that she was using methamphetamine. Mother told her that Father would not allow her to interview the children and the children were at their grandmother's, but FCM Tyler was unable to confirm that Father lived with the grandmother. FCM Tyler testified she received another report on August 3rd that the children had been left at R.J.'s home without Father being present and there were concerns that the children lacked provisions. She indicated she visited R.J.'s home, took photographs of the tent, and interviewed the children separately.

[12] According to FCM Tyler, she introduced herself to A.M. who stated that Father did not like the government. A.M. described an incident in which Mother jumped into the back of a truck while Father was driving and that his grandmother was driving behind them and the children were in her vehicle. A.M. said that they had stayed in a tent in his grandmother's backyard, he did not have access to a shower, and she would not let him in the house to shower. A.M. also said there was a fight in which Father had tried to hit Mother and "he had gotten in the middle and [Father] had hit and bloodied his nose." *Id*. at 57. A.M. referred to Mother as a psycho. She testified that A.M. was dressed in oversized clothing, was not wearing shoes or socks, and had sores on his feet and calves. She also testified that J.M. said that his parents argue and yell and that Father hit him. FCM Tyler indicated that Mother called R.J.'s home, spoke with FCM Tyler, asked multiple times that the children be placed in

foster care, and stated that Father "had taken her to the woods the day before and stripped her naked and beat her for twelve hours and she was terrified for her children's safety." *Id*. at 59. She testified the decision was made to detain the children because Father could not be located and he had not returned to the home after a significant period of time.

[13] FCM Colley testified that she became involved on August 3rd, the day of the removal, and subsequently set up visits with Father, that she tried visitation in the community, and that Father "was erratic and absolutely inappropriate so now we go to an office setting" where there is a security officer and a system in place to contact the police. *Id*. at 65. She testified that she asked him to participate in services and provide drug screens and that "he said absolutely not." *Id*. at 66. She indicated that she had seen Mother in jail twice and Mother indicated that she and Father used to use heroin, then she was on methamphetamine, and that, when she was released from incarceration, Father was on methamphetamine. According to FCM Colley, Mother indicated that, on August 2, 2018, "he shot her up and he used meth." *Id*. at 67. She believed Mother had pending drug charges. She further testified that Mother "talked about the twelve hour beating that she received from [Father]" and "the truck incident where . . . the kids were present . . . and she was it was either pushed or maybe even jumped out, they were fighting her and [Father] took off." *Id*. at 67-68. Mother also "talked about a time at Circle K . . . she was in a pair of underwear, a t-shirt and a bra and he had beat her," "she mouthed back to him," and "that created more beatings." *Id*. at 68.

To the extent Father's argument invites us to reweigh the evidence and reassess witness credibility, we are unable to do so. *See In re S.D.*, 2 N.E.3d at 1286. We conclude the evidence as set forth above and in the record supports the trial court's findings and its determination that the children are in need of services and the coercive intervention of the court is necessary.

For the foregoing reasons, we affirm the trial court's determination that the children are CHINS.

Affirmed.

May, J., and Mathias, J., concur.