## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
May 12 2020, 8:55 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Michael C. Borschel
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

Curtis T. Hill, Jr.
Attorney General of Indiana

Natalie F. Weiss
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of MYR.D. and MYU.D., (Minor Children), Children in Need of Services, <br><br> and <br><br> A.N. (Father), <br> *Appellant-Respondent,* <br><br> v. <br><br> The Indiana Department of Child Services, <br> *Appellee-Petitioner,* | May 12, 2020 <br><br> Court of Appeals Case No. 19A-JC-2967 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Mark A. Jones, Judge <br><br> The Honorable Diana Burleson, Magistrate <br><br> Trial Court Cause No. 49D15-1906-JC-1630 49D15-1906-JC-1631 |

and

Child Advocates, Inc.,
*Guardian ad Litem.*

**Tavitas, Judge.**

# Case Summary

[1] A.N. ("Alleged Father") appeals the trial court's order adjudicating minor children, Myr.D. and Myu.D. (the "Children"), as children in need of services ("CHINS"). We affirm.

# Issue

[2] The sole issue on appeal is whether sufficient evidence supports the CHINS adjudications.

# Facts

[3] In July 2018, M.G. ("Mother") gave birth to the Children, who are fraternal twins. D.D. ("Legal Father") is identified as the Children's father on their birth certificates.

[4] On September 7, 2018, when the Children were two months old, Mother went to Legal Father's home and fought with Legal Father's significant other, S.H.,

who reportedly stabbed Mother in self-defense (the "September 2018 incident"). The September 2018 incident occurred next to Mother's vehicle, in which the Children were strapped into their car seats. Mother was arrested for battery resulting in bodily injury to a pregnant woman and criminal recklessness.[1]

In November 2018, Mother left the four-month-old Children unattended for nearly two hours when she drove to pick up her four-year-old child, S.G.,[2] from his grandmother. Mother also operated her motor vehicle with a suspended license and smoked marijuana. DCS investigated, substantiated the ensuing neglect allegations, and removed the Children. DCS filed a CHINS petition, but subsequently moved to dismiss it. A juvenile court granted the motion.

In early 2019, an unofficial DNA test identified Alleged Father as the Children's biological father. Mother and Alleged Father began, but did not complete, the process of establishing Alleged Father's paternity.

Mother and Alleged Father have a contentious relationship that has occasionally escalated to violence in the presence of S.G. and the Children. The first known incident of domestic violence occurred on June 5, 2019 (the "June 5 incident"), when the Children visited Alleged Father and their paternal grandmother at Alleged Father's apartment. When Mother arrived at the

---

[1] The State subsequently dismissed the criminal recklessness charge pursuant to Mother's guilty plea.

[2] The record alternates between identifying the older child as "S.G." and "S.W." We will identify the child as "S.G." for uniformity.

apartment to retrieve the Children, Mother observed a personal identification card that belonged to a female acquaintance and became angry. Mother pushed and struck Alleged Father, who demanded that Mother leave with the Children. The altercation escalated, and Alleged Father called the police. The Children were in an adjacent room with paternal grandmother during the incident.

[8] After the June 5 incident, Mother consented to a DCS safety plan wherein: (1) Mother would not reside with Alleged Father; (2) a third party would transport the Children to and from Alleged Father's home; and (3) DCS would provide domestic violence resources to Mother and Alleged Father.

[9] The second incident occurred on June 21, 2019 (the "June 21 incident"), after Mother and the Children spent the day at Alleged Father's apartment in violation of the safety plan.[3] That evening, when Alleged Father asked Mother to leave with the Children, Mother became angry and struck Alleged Father. Alleged Father and Mother accused one another of battery with a toy baseball bat. Alleged Father carried Mother out of his apartment, and the police responded to the scene. DCS investigated, removed the Children, and placed the Children with the paternal grandmother.

---

[3] Alleged Father claimed that he allowed Mother access to his apartment because Mother's electrical service was cancelled.

On June 25, 2019, DCS filed a petition alleging as follows that the Children[4] were CHINS pursuant to Indiana Code Section 31-34-1-1:

> a. [Mother and Alleged Father] have failed to provide the children with a safe, stable, and appropriate living environment free from substance abuse and domestic violence.
>
> b. [Mother and Alleged Father] have an extensive history of domestic violence, and they were recently involved in physical altercations while the children were present in the home.
>
> c. The Indianapolis Metropolitan Police Department (IMPD) was dispatched on or about June 5, 2019 and June 21, 2019 due to domestic disturbances between [Mother and Alleged Father].
>
> d. [Mother] minimized the domestic violence and at first stated she was not at [Alleged Father]'s residence on June 21, 2019 and that no physical altercation occurred.
>
> e. However, [Mother and Alleged Father] have since admitted to the physical altercations and that the children were in the home on both occasions.
>
> * * * * *
>
> j. The family has a history with [DCS], and services were previously offered through a [CHINS] action.
>
> k. Despite past services offered, the parents continue to demonstrate an inability to provide the children with a safe, drug-

---

[4] DCS also alleged that S.G. was a CHINS; however, this appeal involves only Alleged Father's children.

free home, and the coercive intervention of the Court is required to ensure the children's safety and well being.

Appellant's App. Vol. II p. 33. Mother and Alleged Father denied the allegations at an initial hearing conducted that same day. The trial court found that removal was necessary for the Children's protection and approved a permanency goal of reunification with Mother and Alleged Father.

[11] The trial court conducted a fact-finding hearing on August 21, 2019. At the time of the fact-finding hearing, neither Mother nor Alleged Father had participated in any domestic violence services. Finding DCS's allegations to be true, the court adjudicated the Children as CHINS on August 29, 2019. The trial court's order recited the details of the September 2018, June 5, and June 21 incidents and further provided:

> The Court finds that the children are in need of services due to [Mother] engaging in 3 separate violent incidents between [Mother] and [S.H.] and between [Mother] and [Alleged Father] when her children were present; [Mother] is on probation for one of the incidents; and [Mother] has been driving with the children despite not having a driver[']s license.

*Id.* at 145. On November 14, 2019, the trial court entered its dispositional order wherein it ordered Alleged Father[5] to: (1) undergo a domestic violence

---

[5] The trial court ordered Mother to: (1) sign any releases necessary for DCS to monitor Mother's compliance with the trial court's order; (2) participate in home-based therapy; (3) undergo a parenting assessment and comply with all recommendations therefrom; and (4) to undergo a domestic violence assessment.

assessment; (2) complete all services and recommendations stemming therefrom; and (3) complete "Father Engagement" programming. *Id*. at 160. Alleged Father now appeals from the CHINS adjudication.

## Analysis

Alleged Father argues that insufficient evidence supports the trial court's CHINS finding. CHINS proceedings are civil actions; thus, "the State must prove by a preponderance of the evidence that a child is a CHINS as defined by the juvenile code." *N.L. v. Ind. Dep't of Child Servs. (In re N.E.)*, 919 N.E.2d 102, 105 (Ind. 2010). On review, we neither reweigh the evidence nor judge the credibility of the witnesses. *In re K.D.*, 962 N.E.2d 1249, 1253 (Ind. 2012). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's CHINS petition. In reviewing findings of fact and conclusions thereon, we apply a two-tiered standard of review. First, we determine whether the evidence supports the findings; and second, we determine whether the findings support the judgment. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). We will set aside the trial court's judgment only if it is clearly erroneous. *Id*. A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id*.

---

Also, on October 24, 2019, the trial court entered, by a default judgment, a dispositional order as to Legal Father, who did not participate in the CHINS proceedings.

[13]     As stated above, DCS alleged the Children were CHINS for reasons of neglect, due to the domestic violence that occurred in their presence, among other reasons.[6] Indiana Code Section 31-34-1-1, which enumerated the circumstances under which a child is a CHINS, provides:

> A child is a child in need of services if before the child becomes eighteen (18) years of age:
>
>> (1) the child's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect of the child's parent, guardian, or custodian to supply the child with necessary food, clothing, shelter, medical care, education, or supervision:
>>
>>> (A) when the parent, guardian, or custodian is financially able to do so; or
>>>
>>> (B) due to the failure, refusal, or inability of the parent, guardian, or custodian to seek financial or other reasonable means to do so; and
>>
>> (2) the child needs care, treatment, or rehabilitation that:
>>
>>> (A) the child is not receiving; and
>>>
>>> (B) is unlikely to be provided or accepted without the coercive intervention of the court.

---

[6] DCS's other bases for the CHINS petition included substantiated allegations of drug use by Mother, pending criminal charges against Mother, and Mother's frequent unlicensed operation of a motor vehicle.

For a juvenile court to adjudicate a child as a CHINS, DCS must prove three elements: (1) the child is under the age of eighteen; (2) one of eleven different statutory circumstances exist that would make the child a CHINS; and (3) the child needs care, treatment, or rehabilitation that he or she is not receiving and is unlikely to be provided or accepted without the coercive intervention of the court. *K.D.*, 962 N.E.2d at 1253.

[14] Alleged Father challenges only element (3) and does not present cogent arguments opposing any other element. Specifically, Alleged Father contends that the trial court entered "a CHINS finding wrongly attributable" to him when: (1) Mother was "the cause [of the] CHINS [ ] finding"; (2) the trial court did not find Alleged Father's conduct "was [ ] cause for concern" or that Alleged Father was to blame regarding the domestic violence incidents; and (3) DCS did not prove "that the children's physical or mental condition [wa]s seriously impaired or seriously endangered" as a result of any inability, refusal, or neglect *by Alleged Father* to supply the Children's essential needs. Father's Br. pp. 8, 10, 19, 20. We cannot agree.

[15] "A CHINS proceeding focuses on the best interests of the children, not the 'guilt or innocence' of either parent." *M.P. v. Ind. Dep't of Child Servs.* (*In re D.P.*), 72 N.E.3d 976, 980 (Ind. Ct. App. 2017). "Because a CHINS determination regards the status of the child, a separate analysis as to each parent is not required in the CHINS determination stage." *In re N.E.*, 919 N.E.2d at 106. Indeed, "the conduct of one parent can be enough for a child to

be adjudicated a CHINS," as "the acts or omissions of one parent can cause a condition that creates the need for court intervention." *Id*. at 105.

[16] Moreover, a juvenile court need not wait until a tragedy occurs before adjudicating a Child a CHINS. *In re R.S.*, 987 N.E.2d 155, 158 (Ind. Ct. App. 2013). Rather, a child is a CHINS when he or she is endangered by parental action or inaction. *In re A.H.*, 913 N.E.2d 303, 306 (Ind. Ct. App. 2009). We have previously held that "a child's exposure to domestic violence can support a CHINS finding." *K.B. v. Indiana Dep't of Child Servs.*, 24 N.E.3d 997, 1003 (Ind. Ct. App. 2015). Additionally, a single incident of domestic violence in a child's presence may support a CHINS finding, and it need not necessarily be repetitive. *See id.* at 1003-04.

[17] In support of his claim, Alleged Father relies upon *D.H v. Marion County Office of Family & Children*, 859 N.E.2d 737 (Ind. Ct. App. 2007); however, Alleged Father's reliance on *D.H.* is misplaced. In *D.H.*, the trial court explicitly declined to find that DCS proved the allegations of sexual abuse; however, the trial court still adjudicated the children as CHINS. On appeal, we found clear error and reversed the judgment. In contrast, here, the trial court adjudicated the Children as CHINS based upon its consideration of the following evidence.

[18] First, family case manager ("FCM") Rochele Stout testified that she received reports "alleg[ing] neglect in the form of life, health and endanger[ment] due to [ ] physical altercation[s] between [Alleged Father and Mother]." Tr. Vol. II p.

26. On direct examination, FCM Stout testified as follows that she interviewed Mother and corroborated the allegations:

> Q: [ ] What did [Mother] tell you with respect to the incident on June 5th?
>
> A: . . . [Mother] indicated that she was picking up her children. She observed a [woman's] ID on [Alleged Father]'s table and inquired about that and [Alleged Father] became defensive and started pushing [Mother] out of the house . . . and [Mother] took the kids out of the house with her.
>
> * * * * *
>
> A: [The Children] were in the apartment with paternal grandmother who was . . . in the adjacent room.

*Id.* at 28. FCM Stout testified that Alleged Father reported, regarding the June 5 incident, that Mother "got upset because she saw a [woman's] ID . . . and proceeded to push [Alleged Father] and hit him and [Alleged Father] tried to block [Mother] while pushing her out of the apartment. [Mother] asked to get [the] Children and she left with [the] Children." *Id.* at 30.

As to the June 21 incident, FCM Stout testified that, upon learning that law enforcement responded to another domestic disturbance between Mother and Alleged Father, FCM Stout contacted Mother, who denied involvement and ended the call "abruptly." *Id.* at 28-29. FCM Stout also interviewed Alleged Father and testified as follows regarding the interview:

A: [Alleged Father] stated on June 21 . . . [Mother] was in his apartment and [Alleged Father] was asking [Mother] that she needed to leave, because she'[d] been there all day and [Mother] hit him and [Alleged Father] stated that they were both pushing each other and [Mother] hit him in the head and the TV with a toy bat and the Children were in the apartment . . . . [Alleged Father] physically picked [Mother] up and took [Mother] out of the apartment and [Mother] left with the children.

* * * * *

A: [ ] I asked [Alleged Father] if there ha[d] been any other physical altercations between [Alleged Father] and [Mother] and [Alleged Father] said yes and [that S.G.] was present [for] at [ ] least one of those [physical altercations].

*Id*. at 30. FCM Stout testified further that she conducted a safety assessment regarding the Children and concluded that the Children were "conditionally safe" because Mother and Alleged Father did not cohabitate; however, FCM Stout still recommended "that the Children be removed[.]" *Id*. at 31.

[20] Next, FCM Lisa Poe testified that, approximately one week before the fact-finding hearing, Mother and Alleged Father reported that neither had undergone the court-ordered domestic violence assessment or participated in domestic violence services. FCM Poe testified that DCS's concerns for the Children's "safety and their emotional health[,]" thus, remained high. *Id*. at 44; FCM Poe testified further that, if Mother and Alleged Father did not participate in domestic violence services, there was potential for danger to the Children. *See id*. at 43 ("If the domestic violence pattern is continued in front of the

[C]hildren, then it can affect their development."). Also, FCM Poe testified that her efforts to engage Mother and Alleged Father on the issue of domestic violence were met with "very limited response from either person." *Id*. at 44.

[21] During Mother's testimony, Mother confirmed that the Children were present during the September 2018, June 5, 2019, and June 21, 2019, incidents and that law enforcement was notified each time. Mother also admitted that, in the September 2018 incident, she drove without a license to Legal Father's residence[7] "with [the Children] in car seats," fought with S.H., and suffered a stab wound as she stood "right outside [her] car door" in close proximity to the Children. *Id*. at 12, 17. Lastly, Alleged Father testified that he had no concerns regarding his or Mother's parenting abilities; and that the coercive intervention of the trial court was unnecessary regarding his parenting of the Children. Neither Mother nor Alleged Father denied that the Children were present in the home during the June 5 and June 21 incidents of domestic violence.

[22] In *K.B.,* we affirmed the trial court's adjudication of the parties' children as CHINS because the children witnessed domestic violence *and were old enough to comprehend it*. As the *K.B.* panel held: "a child's exposure to domestic violence can support a CHINS finding"; and "a single incident of domestic violence in a child's presence may support a CHINS finding . . . ." *K.B.*, 24 N.E.3d at 1003-

---

[7] Mother also testified that, although she has never been issued a driver's license, she has "been driving" and has been charged five times with driving while suspended, tr. vol. II p. 10; and that Mother pleaded guilty to battering S.H., who was pregnant.

04.  Here, we acknowledge that the Children were eleven months old and unable to comprehend their exposure to the violent September 2018, June 5, and June 21 incidents; however, the Children were also completely defenseless with regard thereto.  We find, even more so here, that the Children's exposure to domestic violence supports a CHINS finding.  *See* Appellant's App. Vol. II p. 49 ("[S.G. and the Children] are all under the age of five years.  [The Children] are infants and unable to protect themselves from neglect and abuse.").

[23]  Moreover, the record reveals that, pursuant to the DCS safety plan, Mother and Alleged Father were required to undergo domestic violence assessments, to comply with recommendations therefrom, and to participate in domestic violence services.  Mother and Alleged Father were also required to engage a third party to transport the Children to and from Alleged Father's home; however, the occurrence of the June 21, 2019, incident at Alleged Father's home establishes that Mother and Alleged Father disregarded this requirement.

[24]  Despite the fact that the Children were present in the home during the June 5 and June 21 incidents, by the time of the fact-finding hearing, neither Mother nor Alleged Father had participated in any domestic violence services.  Accordingly, FCM Poe testified that DCS remained concerned for the Children's physical and emotional safety.  Given Alleged Father's and Mother's: (1) history of domestic violence; (2) failure to comply with DCS's safety plan; (3) failure to participate in the court-ordered domestic violence assessment or services; and (4) unwillingness to acknowledge, beyond a "limited response[,]" DCS's concerns regarding either party's parenting

abilities, we find that the record supports the trial court's finding that the Children needed care, treatment, or rehabilitation that they were not receiving and that was unlikely to be provided or accepted without the coercive intervention of the court. *See K.D.*, 962 N.E.2d at 1253. Accordingly, DCS proved, by a preponderance of the evidence, that the Children were CHINS. We find no clear error.

# Conclusion

[25] Sufficient evidence supports the trial court's CHINS determination. We affirm.

[26] Affirmed.

Riley, J., and Mathias, J., concur.